Pfeifer, J.
{¶ 1} We decide in this case whether the United States Supreme Court’s holding in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), prohibiting the imposition of sentences of life imprisonment without parole on juvenile nonhomicide offenders also prohibits the imposition of a term-of-years prison sentence that exceeds the offender’s life expectancy on a juvenile nonhomi-cide offender. We hold that pursuant to Graham, a term-of-years prison sentence that exceeds a defendant’s life expectancy violates the Eighth Amendment to the United States Constitution when it is imposed on a juvenile nonhomicide offender.
FACTUAL AND PROCEDURAL BACKGROUND
Moore’s Crimes
{¶ 2} The facts of this case do not engender a sense of sympathy for appellant, Brandon Moore. Moore embarked on a criminal rampage of escalating depravity on the evening of August 21, 2001, in Youngstown. He was then 15 years old. Early that evening, Moore robbed at gunpoint Jason Cosa and Christine Hammond in the driveway of Cosa’s home. Cosa and Hammond saw Moore get into an awaiting dark, older automobile as he fled the scene.
*558 {¶ 3} Later that night, at around 10:20, M.K., a 21-year-old student at Youngstown State University, arrived for her night-shift job at a group home for mentally handicapped women. While removing some things from the trunk of her car, she noticed a black car driving up the street and stopping a few houses away. Moore, wearing a mask, emerged from the vehicle and started running toward her. When he arrived at her vehicle, he pressed a gun against her and instructed her to give him all her money and belongings. When a porch light came on at the group home, Moore ordered M.K. to get into the passenger seat of her car. Moore then got into the driver’s seat, ordered M.K. to start the car, and drove away with her.
{¶ 4} As they were driving, he ordered her to give him her jewelry. After they drove a short distance, Moore stopped the car briefly behind the black car. Chaz Bunch entered the victim’s car through the rear passenger door. Bunch put a gun to her head and demanded her money.
{¶ 5} Moore continued driving, following the black car, which was being driven by Andre Bundy. As Moore drove, he inserted his fingers into M.K’s vagina. M.K. pleaded for her life. At one point, Moore drove close enough to the black car that he almost hit it, jerking to a stop; at that point, the cars were so close that M.K. could make out the black car’s license plate. She memorized the number.
{¶ 6} Eventually, Moore pulled ahead of the black car and drove down a dead-end street. The black car followed. Both cars parked near a gravel lot, and Bunch ordered M.K. out of the car. Once outside the car, Moore and Bunch assaulted M.K., grabbing her by the hair and forcing their penises into her mouth; one would orally rape her while the other forced her head down. This was repeated two or three times, at gunpoint.
{¶ 7} Moore and Bunch then directed M.K. to the trunk of her car. At this point, another man, Jamar Callier, exited the black car and went through M.K’s belongings in the trunk. M.K. was told to pull her pants down and turn around. M.K. resisted, and in an attempt to avoid any further violence, told the attackers she was pregnant (she was not, in' fact, pregnant). But they showed no mercy; Moore and Bunch pushed her against the car, and at least one of them anally raped her.
{¶ 8} After the anal rape, Bunch threw M.K. to the ground, and he and Moore proceeded to vaginally and orally rape her. While one raped her vaginally, the other would force his penis into her mouth, and they would then switch places. Both were armed during the rapes.
{¶ 9} The attack finally ended when Callier pushed Bunch off M.K. Bunch said that he wanted to kill M.K., but Callier would not let him, telling Bunch that he could not kill a pregnant woman. Moore put his gun into M.K’s mouth and told *559 her, “Since you were so good, I won’t kill you.” Moore warned her that they knew who she was; he threatened to harm her and her family if she told anyone what had happened.
{¶ 10} Hysterical, M.K. got back into her car and drove immediately to the home of a relative of her boyfriend, where she had been attending a cookout before leaving to go to work. She arrived back at the party, got out of her car, and ran through the yard, screaming for help. When people came to her aid, she immediately yelled out the license-plate number she had memorized. Based on the license-plate number, police were eventually able to arrest all four people involved in the attack on M.K.
{¶ 11} In her testimony at trial, M.K. described the effect of the attack on her life: “[T]hey killed a part of me. They killed a part of my [soul] that I can never get back.”
Moore’s Convictions
{¶ 12} After Moore was taken into custody, juvenile proceedings were initiated against him. The case was transferred to the General Division of the Mahoning County Court of Common Pleas; a 12-count complaint with 11 firearm specifications was filed against Moore on May 16, 2002, for the crimes committed against Jason Cosa, Christine Hammond, and M.K. The complaint included three counts of aggravated robbery in violation of R.C. 2911.01(A)(1), three counts of rape in violation of R.C. 2907.02(A)(2), three counts of complicity to commit rape in violation of R.C. 2923.03(A)(2) and '2907.02(A)(2), one count of kidnapping in violation of R.C. 2905.01(A)(4), one count of conspiracy to commit aggravated robbery in violation of R.C. 2923.01(A)(1) and 2911.01(A)(1), and one count of aggravated menacing in violation of R.C. 2903.21(A).
{¶ 13} Moore, Bunch, and Bundy were tried together. The trial began on September 23, 2002. On October 2, 2002, the jury found Moore guilty of all 12 counts and all the specifications. At the October 23, 2002 sentencing hearing, the trial court concluded that Moore “[could not] be rehabilitated, that it would be a waste of time and money and common sense to even give it a try.” The court announced to Moore, “I want to make sure you never get out of the penitentiary, and I’m going to make sure that you never get out of the penitentiary.” It sentenced Moore to the maximum prison term for each count, to be served consecutively, except for the menacing charge, which was to be served concurrently with the other sentences. The court also sentenced Moore to a prison term for each of the 11 firearm specifications, also to be served consecutively. The sentence totaled 141 years in prison.
*560 Moore’s Appeals
{¶ 14} Moore’s appellate history is lengthy and knotty. We untangle it enough to establish the relevant through-line for purposes of the present appeal from the court of appeals’ denial of Moore’s application for reconsideration in his third direct appeal.
{¶ 15} In Moore’s first appeal, State v. Moore, 161 Ohio App.3d 778, 2005-Ohio-3311, 832 N.E.2d 85 (7th Dist.) (“Moore I ”), the appellate court vacated Moore’s conviction for conspiracy to commit aggravated robbery as well as the accompanying firearm specification. Id. at ¶ 23. As for the other ten firearm specifications, the appellate court instructed the trial court to impose at resentencing a total of four separate terms: one for the specification attached to the charge for the aggravated robbery of Cosa and Hammond and three for the specifications attached to the charges for the aggravated robbery, rape, and kidnapping of M.K. Id. at ¶ 55.
{¶ 16} On September 7, 2005, the trial court, on remand, resentenced Moore according to the appellate court’s instruction. The new sentence totaled 112 years. Moore appealed again, and in State v. Moore, 7th Dist. Mahoning No. 05 MA 178, 2007-Ohio-7215, 2007 WL 4696843 (“Moore II ”), the appellate court vacated the entire sentence and remanded for resentencing because Moore’s previous sentence had involved judicial fact-finding of the kind declared unconstitutional by this court in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.
{¶ 17} On February 5, 2008, the trial court resentenced Moore to the aggregate 112-year prison term. The judge told Moore at the sentencing hearing, “[I]t is the intention of this court that you should never be released from the penitentiary.”
{¶ 18} Moore’s appeal from that sentence is' the root of the present appeal. Moore appealed his resentencing, but his court-appointed counsel filed a brief pursuant to Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), seeking to withdraw from the case; Anders “permit[s] an attorney who, after conscientious examination of the record, concludes that a criminal appeal is wholly frivolous to so advise the court and request permission to withdraw, provided that his request is accompanied with a brief identifying anything in the record that could arguably support the client’s appeal,” Disciplinary Counsel v. Milhoan, 142 Ohio St.3d 230, 2014-Ohio-5459, 29 N.E.3d 898, ¶ 8. Moore’s counsel was unable to identify any issue that could arguably support an appeal, stating that he found “this third appeal to be frivolous in the legal sense and without merit,” and the court granted his motion to withdraw. State v. Moore, 7th Dist. Mahoning No. 08 MA 20, 2009-Ohio-1505, 2009 WL 825758 (“Moore III”). The court went on to consider the assignment of error that Moore had raised in his *561 pro se brief—that his resentencing pursuant to Foster violated his due-process rights—and reviewed the entire record, concluded that Moore’s appeal was meritless, and affirmed the trial court’s judgment. Moore III at ¶ 24. The court announced its decision on March 24, 2009. It is this decision that Moore moved the court to reconsider—but he did not do so until September 16, 2013.
{¶ 19} In the meantime, Moore pursued other avenues of relief, and in that branch of his appellate history, first sought relief based on Graham, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825. On December 30, 2009, Moore filed a petition for a writ of mandamus and/or a writ of procedendo in the Seventh District Court of Appeals, seeking to compel the trial court to issue a final, appealable judgment entry of sentence for his original 2002 convictions that would comply with Crim.R. 32(C), containing all the elements set forth by this court in State v. Baker, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163. On March 30, 2010, the court of appeals partially granted Moore’s petition, ordering the trial court to issue a revised sentencing entry that complied with Crim.R. 32(C). State ex rel. Moore v. Krichbaum, 7th Dist. Mahoning No. 09 MA 201, 2010-Ohio-1541, 2010 WL 1316230 (“Moore IV”).
{¶ 20} On April 20, 2010, the trial court issued a nunc pro tunc sentencing entry that complied with Crim.R. 32(C). On May 17, 2010, the United States Supreme Court decided Graham, holding that “for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole.” Graham at 74. That same day, Moore filed a notice of appeal from the trial court’s nunc pro tunc entry; in his brief in support filed December 9, 2010, Moore raised several issues, including that pursuant to Graham, his 112-year sentence violated the Eighth Amendment to the United States Constitution.
{¶ 21} Diming the pendency of that appeal, this court held in State v. Lester, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, paragraph one of the syllabus, that “[a] nunc pro tunc judgment entry issued for the sole purpose of complying with Crim.R. 32(C) to correct a clerical omission in a final judgment entry is not a new final order from which a new appeal may be taken.” Based on that decision, the court of appeals dismissed Moore’s appeal from the nunc pro tunc entry. State v. Moore, 7th Dist. Mahoning No. 10-MA-85, 2011-Ohio-6220, 2011 WL 6017942 (“Moore V”). Although it dismissed the appeal on the basis of Lester, the court briefly addressed Moore’s Graham-centered claim, stating that it was “barred in this case by the doctrine of res judicata” and that it was an “argument * * * more properly raised in a petition for postconviction relief.” Moore V at ¶ 33. The court’s decision was announced on November 30, 2011.
{¶ 22} On September 16, 2013, about a month after gaining new counsel, Moore filed an application for delayed reconsideration of the court of appeals’ decision in *562 Moore III, pursuant to App.R. 26(A)(1) and 14(B). App.R. 26(A)(1) allows a party to file an application to request the panel that issued a decision to reconsider its decision, but that application must be made no later than ten days after the clerk of the court has mailed the judgment or order to the parties. App.R. 14(B) allows for an exception to the App.R. 26(A)(1) timeline—the court may enlarge the time for filing an application for reconsideration “on a showing of extraordinary circumstances.” Moore argued that the court should reconsider his appeal because his sentence was unconstitutional pursuant to Graham and Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). In Miller, a case involving a juvenile who had been convicted of murder and sentenced to a mandatory term of life imprisonment without parole, the court held that “the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders,” reasoning that “[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.” Id. at 479.
{¶ 23} A divided court denied Moore’s application. The majority’s two-paragraph opinion cited its judgment entries denying similar applications in State v. Bunch, 7th Dist. Mahoning No. 06 MA 106 (Aug. 8, 2013), which involved one of Moore’s codefendants, and State v. Barnette, 7th Dist. Mahoning No. 06 MA 135 (Sept. 16, 2013). State v. Moore, 7th Dist. Mahoning No. 08 MA 20, 2013-Ohio-5868, 2013 WL 6918852, ¶ 2.
{¶ 24} In Bunch, the court first considered the timeliness of the application for reconsideration under App.R. 26(A)(1); the decision appealed from had been announced in 2007, but Bunch’s application was not filed until 2013. Since the application was untimely, the court next considered whether Bunch had shown extraordinary circumstances meriting an enlargement of the time to request reconsideration pursuant to App.R. 14(B). Ultimately, the court held that Bunch had failed to show extraordinary circumstances, for two reasons.
{¶ 25} First, the court looked to the delay from the date of the Graham decision to the date the application for reconsideration was filed, a period of almost three years: “The almost three year delay in filing the application for reconsideration and motion to enlarge time does not lend support for a finding of extraordinary circumstances. Had the application and motion been filed more closely in time to the Graham decision it could support a finding of extraordinary circumstances.” Bunch at 3.
{¶26} Second, and “most important,” the court stated that “when appellate courts have found extraordinary circumstances based on binding decisions from higher courts, they have done so when the higher court’s case is directly on point.” Id. The court explained, “The basis for this reasoning is that appellate *563 courts will grant reconsideration petitions when either there is an obvious error in the appellate court’s decision or when it is demonstrated that the appellate court did not properly consider an issue.” Id. If a higher court’s decision is not directly on point, the court reasoned, then any error would not be obvious and would not warrant the requisite finding of extraordinary circumstances.
{¶ 27} The court in Bunch pointed out that both Graham and Miller concerned cases that “were based specifically on life sentences without the possibility of parole; they were not based on ‘de facto’ life sentences.” Id. at 4. Thus, according to the court, although Bunch was a juvenile when he committed his crimes and his fixed-term sentence was 89 years, the fact that his sentence may be considered a “de facto” life sentence meant that his case was not directly on point with Graham or Miller. Further, the court stated that “as of yet, no Ohio Supreme Court or United States Supreme Court decision has extended the Graham or Miller holding to ‘de facto’ life sentences.” Id.
{¶ 28} The other decision the court cited in rejecting Moore’s application for reconsideration, Barnette (another case in which the appellant sought reconsideration of a 2007 decision in 2013), contained reasoning and language virtually identical to the court’s decision in Bunch.
{¶ 29} Moore appealed the denial of his application for reconsideration to this court. The cause is before this court upon the acceptance of a discretionary appeal. 138 Ohio St.3d 1467, 2014-Ohio-1674, 6 N.E.3d 1204. Moore raises one proposition of law: “The Eighth Amendment prohibits sentencing a juvenile to a term-of-years sentence that precludes any possibility of release during the juvenile’s life expectancy.”
LAW AND ANALYSIS
Moore’s Sentence
{¶ 30} To begin, we establish the potential prison term we are addressing in this case. Moore accepts the state’s interpretation of the effect of R.C. 2929.20(C)(5) on his 112-year sentence; under that interpretation, Moore would become eligible to file a motion for judicial release after serving 77 years of his sentence. R.C. 2929.20(C)(5) allows an offender to seek judicial release five years after the completion of the mandatory portions of the offender’s sentence. Moore’s six ten-year sentences relating to rape are mandatory, R.C. 2929.13(F), as are his four three-year sentences under the gun specifications, R.C. 2941.145. Moore would have to serve five additional years beyond the mandatory 72 years, for a total of 77 years, before becoming eligible to seek judicial release. Moore would thus be 92 years old before he would have his first chance to move a court for release. There is no dispute that his life expectancy falls well short of 92 years. A male who was 15 years of age in 2002 had a life expectancy of an *564 additional 60.2 years; a 15-year-old black male had a life expectancy of an additional 54.9 years. U.S. Department of Health and Human Services, National Vital Statistics Reports, Volume 52, Number 3, at 26 (2003), http://www.cdc.gov/ nchs/data/nvsr/nvsr52/nvsr52_03.pdf (accessed Oct. 5, 2016). Therefore, we must consider whether a minimum 77-year sentence, i.e., a sentence that extends beyond the life expectancy of the offender, is constitutional when imposed on a 15-year-old nonhomicide offender.
Proportionality Review
{¶ 31} The Eighth Amendment to the United States Constitution states, “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” A key component of the Constitution’s prohibition against cruel and unusual punishment is the “precept of justice that punishment for crime should be graduated and proportioned to [the] offense.” Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). “Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment.” Montgomery v. Louisiana, - U.S. -, 136 S.Ct. 718, 732-733, 193 L.Ed.2d 599 (2016).
{¶ 32} There are two classifications of proportionality review—one involving the length of term-of-years sentences given in a particular case and the other involving categorical restrictions. In this case, we deal with a categorical restriction. Within that classification, there are two subsets. One subset considers the nature of the offense—for example, in Kennedy v. Louisiana, 554 U.S. 407, 437, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), the United States Supreme Court held that capital punishment is impermissible for defendants who commit a nonhomicide rape of a child. The second subset considers the characteristics of the offender; in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), for instance, the court ruled that the Eighth Amendment prohibits the execution of a mentally retarded defendant.
{¶ 33} In recent years, the United States Supreme Court has established categorical prohibitions of certain punishments for juveniles, pursuant to the Eighth Amendment. In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the court prohibited imposition of the death penalty on defendants who committed their crimes before the age of 18; in Graham, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825, the court prohibited the imposition of life-without-parole sentences on juvenile offenders who did not commit homicide; and in Miller, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407, the court prohibited the mandatory imposition of life-without-parole sentences on offenders who had committed murder as juveniles.
{¶ 34} Our focus in this case is Graham. The court did not address in Graham whether a term-of-years prison sentence that extends beyond an offender’s life *565 expectancy—a functional life sentence—falls under the Graham categorical bar. But we conclude that Graham does establish a categorical prohibition of such sentences.

Graham

{¶ 35} Graham held that sentences of life imprisonment without parole for juvenile nonhomicide offenders were cruel and unusual in violation of the Eighth Amendment in light of three factors—the limited moral culpability of juvenile nonhomicide offenders, the inadequacy of penological theory justifying the length of life-without-parole sentences for such offenders, and the severity of life-without-parole sentences. Graham at 74.
{¶ 36} First, the court explained in Graham that a juvenile who did not kill or intend to kill has “twice diminished moral culpability” based on two factors: the nature of the crime and the juvenile’s age. Id. at 69. As for the nature of the crime, the court found that “[although an offense like robbery or rape is ‘a serious crime deserving serious punishment,’ Enmund [v. Florida, 458 U.S. 782] 797, 102 S.Ct. 3368, [73 L.Ed.2d 1140 (1982)], those crimes differ from homicide crimes in a moral sense,” such that nonhomicide defendants “are categorically less deserving of the most serious forms of punishment than are murderers.” Graham at 69.
{¶ 37} In addition, juveniles are less morally culpable than adults due to their youth and what comes with it:
[Roper and Graham] relied on three significant gaps between juveniles and adults. First, children have a “ ‘lack of maturity and an underdeveloped sense of responsibility,’ ” leading to recklessness, impulsivity, and heedless risk-taking. Roper, 543 U.S., at 569, 125 S.Ct. 1183. Second, children “are more vulnerable * * * to negative influences and outside pressures,” including from their family and peers; they have limited “contro[l] over their own environment” and lack the ability to extricate themselves from horrific, crime-producing settings. Ibid. And third, a child’s character is not as “well formed” as an adult’s; his traits are “less fixed” and his actions less likely to be “evidence of irretrievable] depravity].” Id., at 570, 125 S.Ct. 1183.
(Ellipsis sic.) Miller, 567 U.S. at 471, 132 S.Ct. 2455, 183 L.Ed.2d 407.
{¶ 38} Because of the characteristics of youth, a depraved crime committed by a juvenile may not be indicative of an irredeemable individual.
*566 These salient characteristics mean that “[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.” [Roper] at 573, 125 S.Ct. 1183. Accordingly, “juvenile offenders cannot with reliability be classified among the worst offenders.” Id., at 569, 125 S.Ct. 1183. A juvenile is not absolved of responsibility for his actions, but his transgression “is not as morally reprehensible as that of an adult.” Thompson [v. Oklahoma, 487 U.S. 815] 835, 108 S.Ct. 2687, [101 L.Ed.2d 702 (1988)] (plurality opinion).
Graham, 560 U.S. at 68, 130 S.Ct. 2011, 176 L.Ed.2d 825.
{¶ 39} The inherently diminished moral culpability and other characteristics of juvenile offenders means that the recognized, legitimate goals of penal sanctions'—-retribution, deterrence, incapacitation, and rehabilitation—do not justify the imposition of the harshest penalties on juveniles who have committed nonhomicide crimes:
Roper and Graham emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because “ ‘[t]he heart of the retribution rationale’ ” relates to an offender’s blameworthiness, “ ‘the case for retribution is not as strong with a minor as with an adult.’ ” Graham, 560 U.S., at 71, 130 S.Ct., at 2028 (quoting Tison v. Arizona, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); Roper, 543 U.S., at 571, 125 S.Ct. 1183). Nor can deterrence do the work in this context, because “ ‘the same characteristics that render juveniles less culpable than adults’ ”—their immaturity, recklessness, and impetuosity— make them less likely to consider potential punishment. Graham, 560 U.S., at 72, 130 S.Ct., at 2028 (quoting Roper, 543 U.S., at 571, 125 S.Ct. 1183). Similarly, incapacitation could not support the life-without-parole sentence in Graham: Deciding that a “juvenile offender forever will be a danger to society” would require “mak[ing] a judgment that [he] is incorrigible”—but “ ‘incorrigibility is inconsistent with youth.’ ” 560 U.S., at 72-73, 130 S.Ct., at 2029 (quoting Workman v. Commonwealth, 429 S.W.2d 374, 378 (Ky.App.1968)). And for the same reason, rehabilitation could not justify that sentence. Life without parole “forswears altogether the rehabilitative ideal.” Graham, 560 U.S., at 74, 130 S.Ct., at 2030. It reflects “an irrevocable judgment about [an offender’s] value and place in society,” at odds with a child’s capacity for change. Ibid.
*567 (Brackets sic.) Miller at 472-473.
{¶ 40} The severity of the life-without-parole penalty also formed part of the basis of the court’s decision in Graham. Graham explained that life-without-parole sentences are harsher when imposed on juveniles than when they are imposed on older defendants:
Life without parole is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. * * * This reality cannot be ignored.
Graham at 70-71.
{¶ 41} The imposition of the most severe penalties on juveniles is contrary to what the court described in Miller, 567 U.S. at 461-462, 132 S.Ct. 2455, 183 L.Ed.2d 407, as “Graham’s (and also Roper’s) foundational principle: that imposition of a State’s most severe penalties on juvenile offenders cannot proceed as though they were not children.”
{¶ 42} The most important attribute of the juvenile offender is the potential for change. Graham relates the difficulty in determining whether the commission of a crime is the result of immaturity or of irredeemable corruption. And so Graham protects juveniles categorically from a final determination while they are still youths that they are irreparably corrupt and undeserving of a chance to reenter society. “It remains true that ‘[fjrom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor’s character deficiencies will be reformed.’ ” Graham, 560 U.S. at 68, 130 S.Ct. 2011, 176 L.Ed.2d 825, quoting Roper, 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1.
{¶ 43} That is why Graham recognizes that although an offender convicted as a juvenile can ultimately spend a lifetime in jail, the offender has to be given a chance at some point to prove himself worthy of reentering society. A sentence must not “den[y] the juvenile offender a chance to demonstrate growth and maturity. Incapacitation cannot override all other considerations, lest the Eighth Amendment’s rule against disproportionate sentences be a nullity.” Id. at 73.
{¶ 44} Still, Graham does not foreclose the possibility that a defendant who commits a heinous crime as a youth will indeed spend his entire remaining *568 lifetime in prison; Graham does not guarantee an eventual release. “What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.” Id. at 75. Graham leaves it to the states to determine how to achieve that requirement: “It is for the State, in the first instance, to explore the means and mechanisms for compliance.” Id.
{¶ 45} Again, the state retains the ability, upon a meaningful evaluation of an offender who committed a nonhomicide as a juvenile, to impose lifetime incarceration upon the most serious offenders. “The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.” Graham, 560 U.S. at 75, 130 S.Ct. 2011, 176 L.Ed.2d 825.
{¶ 46} The court in Graham did not establish a limit to how long a juvenile can remain imprisoned before getting the chance to demonstrate maturity and rehabilitation. But it is clear that the court intended more than to simply allow juveniles-turned-nonagenarians the opportunity to breathe their last breaths as free people. The intent was not to eventually allow juvenile offenders the opportunity to leave prison in order to die but to live part of their lives in society. The court stated in Montgomery, a case involving a defendant who had been convicted of murder as a juvenile,
In light of what this Court has said in Roper, Graham, and Miller about how children are constitutionally different from adults in their level of culpability, * * * prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored.
Montgomery, — U.S. -, 136 S.Ct. at 736-737, 193 L.Ed.2d 599.
{¶ 47} It does not take an entire lifetime for a juvenile offender to earn a first chance to demonstrate that he is not irredeemable. Pursuant to Graham, the Eighth Amendment prohibits the imposition of a sentence that denies a juvenile some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.
Applying Graham

Term-of-Years Sentences

{¶ 48} The state argues that Graham applies only to juvenile offenders sentenced to life imprisonment without parole for a nonhomicide offense. Al *569 though the defendant in Graham was serving a life sentence, we conclude that the principles behind Graham apply equally to a juvenile nonhomicide offender sentenced to prison for a term of years that extends beyond the offender’s life expectancy.
{¶ 49} Graham cited the lessened moral culpability of juvenile offenders, the severity of the sentence, and the inapplicability of penological justifications for life sentences for juveniles as reasons for declaring life sentences for juvenile nonhomicide offenders unconstitutional under the Eighth Amendment. Those same factors apply to term-of-years prison sentences that exceed a juvenile offender’s expected lifespan.
{¶ 50} As in Graham, in this case the defendant was convicted of nonhomicide offenses that he committed as a juvenile and thus has twice-diminished moral culpability. That is the overriding element in this case. As the court stated in Miller, “[Cjhildren are different,” and “ ‘ “[o]ur history is replete with laws and judicial recognition” that children cannot be viewed simply as miniature adults.’ J.D.B. [v. North Carolina], 564 U.S. [261], at 274, 131 S.Ct. 2394, at 2404 [180 L.Ed.2d 310 (2011)] (quoting Eddings [v. Oklahoma], 455 U.S. [104], at 115-116, 102 S.Ct. 869 [71 L.Ed.2d 1 (1982)]).” Miller, 567 U.S. at 480, 481, 132 S.Ct. 2455, 183 L.Ed.2d 407.
{¶ 51} The protections in Graham flow from the defendant’s juvenile status. The question we must consider is whether, under Graham, there is a consequential distinction between the life sentence imposed in Graham and the sentence imposed in this ease, which extends beyond Moore’s life expectancy.
{¶ 52} Did the trial court sentence Moore to life in prison? Undoubtedly, that was the aim of the sentencing court, as reflected in its statements at sentencing— “I want to make sure you never get out of the penitentiary, and I’m going to make sure that you never get out of the penitentiary”—and at resentencing— “[I]t is the intention of this court that you should never be released from the penitentiary.” The fact that Moore could survive his current sentence is not outside the realm of possibility; Moore accepts the state’s interpretation of R.C. 2929.20(C)(5), under which he would become eligible to file a motion for judicial release after serving 77 years of his sentence. Still, Moore would be 92 years old, well beyond his life expectancy, before he would have his first chance to move the court for release.
{¶ 53} Graham discusses the fact that under a life-without-parole sentence, a juvenile offender “will on average serve more years and a greater percentage of his life in prison than an adult offender.” Graham, 560 U.S. at 70, 130 S.Ct. 2011, 176 L.Ed.2d 825. The same mathematical reality—that a person who begins serving a life sentence as a juvenile serves a greater number of years and a greater percentage of his or her life in prison than a person who starts serving *570 his sentence as an adult—extends to multidecade sentences that outstrip a juvenile’s life expectancy. The practical reality is that juveniles sentenced to terms extending beyond their life expectancies are serving the lengthiest sentences—in terms of the number of years actually served in prison—that a state can impose.
{¶ 54} In Sumner v. Shuman, 483 U.S. 66, 83, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987), the court compared sentences of life without parole and term-of-years sentences extending beyond an offender’s life expectancy in addressing a Nevada statute that imposed a mandatory death sentence on a prisoner who committed murder in prison while serving a life-without-parole sentence. The court responded to the argument that the death penalty was a necessary deterrent to a person serving a life-without-parole sentence: “Close consideration of the deterrence argument also points up the fact that there is no basis for distinguishing, for purposes of deterrence, between an inmate serving a life sentence without possibility of parole and a person serving several sentences of a number of years, the total of which exceeds his normal life expectancy.” Id. The court recognized that a person serving a term-of-years sentence extending beyond his life expectancy is in as hopeless a situation as a person serving a sentence of life without parole.
{¶ 55} The court held in Graham that life-without-parole sentences lacked penological justification when imposed on juvenile nonhomicide offenders. If “none of the goals of penal sanctions that have been recognized as legitimate— retribution, deterrence, incapacitation, and rehabilitation * * *—provides an adequate justification” for imposing a life-without-parole sentence on a juvenile nonhomicide offender, Graham at 71, then a term-of-years sentence that extends beyond a juvenile nonhomicide offender’s expected lifespan does not have peno-logical justification either. As the court held in Graham, retribution is related to the moral culpability of the offender; retribution does not justify imposing on a person with twice-diminished moral culpability a sentence that is the most severe in terms of years served that a state can impose.
{¶ 56} Deterrence is also insufficient to justify the practice of imposing a sentence on a juvenile that extends past his life expectancy. Graham held that “[djeterrence does not suffice to justify” a life sentence: “Because juveniles’ ‘lack of maturity and underdeveloped sense of responsibility * * * often result in impetuous and ill-considered actions and decisions,’ Johnson v. Texas, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), they are less likely to take a possible punishment into consideration when making decisions.” (Ellipsis sic.) Graham, 560 U.S. at 72, 130 S.Ct. 2011, 176 L.Ed.2d 825. It is unrealistic to think that a sentence that likely extends for a lifetime could have more of a deterrent effect on a child than a life-without-parole sentence.
*571 {¶ 57} The penological goal of incapacitation falls short as a justification for term-of-years sentences that extend beyond a juvenile’s expected lifespan because of the inability to determine whether a juvenile offender is incorrigible and necessitates being separated from society for what will probably be the remainder of the juvenile’s lifetime. “To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable.” Id. at 72-73.
{¶ 58} Finally, as far as rehabilitation is concerned, like a life-without-parole sentence, a term-of-years sentence that extends beyond a juvenile’s life expectancy “forswears altogether the rehabilitative ideal. By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person’s value and place in society. This judgment is not appropriate in light of a juvenile nonhomicide offender’s capacity for change and limited moral culpability.” Id. at 74.
{¶ 59} The sentence imposed on Moore is functionally a life sentence. We see no significant difference between a sentence of life imprisonment without parole and a term-of-years prison sentence that would extend beyond the defendant’s expected lifespan before the possibility of parole. The court in Graham was not barring a terminology—“life without parole”—but rather a punishment that removes a juvenile from society without a meaningful chance to demonstrate rehabilitation and obtain release. The state may not impose at the outset its harshest sentences on a person -with twice-diminished moral culpability.
{¶ 60} It makes little sense that a juvenile offender sentenced to prison for life without parole would get a chance, pursuant to Graham, to prove his or her rehabilitation and be released but a juvenile offender sentenced to a functional life term would not. Could a court that imposed an unconstitutional life-without-parole sentence on a juvenile offender correct Eighth Amendment deficiencies upon remand by resentencing the defendant to a term-of-years sentence when parole would be unavailable until after the natural life expectancy of the defendant? Certainly not.
{¶ 61} Further, the United States Supreme Court has all but abolished life-without-parole sentences even for those juveniles who commit homicide:
Miller did not go so far as to bar courts from imposing the sentence of life without the possibility of parole on a juvenile. Yet because of the severity of that penalty, and because youth and its attendant circumstances are strong mitigating factors, that sentence should rarely be imposed on juveniles.
*572 State v. Long, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 29, citing Miller, 567 U.S. at 479-480, 132 S.Ct. 2455, 183 L.Ed.2d 407. As the court recognized in Montgomery, “Before Miller, every juvenile convicted of a homicide offense could be sentenced to life without parole. After Miller, it will be the rare juvenile offender who can receive that same sentence.” Montgomery, — U.S. -, 136 S.Ct. at 734, 193 L.Ed.2d 599. Graham cannot stand for the proposition that juveniles who do not commit homicide must serve longer terms in prison than the vast majority of juveniles who commit murder, who, because of Miller, are all but assured the opportunity to demonstrate maturity and rehabilitation at a meaningful point in their sentences.
{¶ 62} Under his current sentence, Moore would probably die in prison. If he did survive the 77 years that he is required to serve, his period of incarceration likely would be among the longest ever served in Ohio. That would be the case despite the fact that he did not commit the ultimate crime of murder and was not fully formed when he committed his nonhomicide crimes. The “imposition of a State’s most severe penalties on juvenile offenders cannot proceed as though they were not children.” Miller at 474. Because Moore was a child when he committed his crimes, he must be treated differently, pursuant to Graham. The key principle in Graham is that the commission of a nonhomicide offense in childhood should not preclude the offender from the opportunity to someday demonstrate that he is worthy to reenter society: “The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term.” Graham, 560 U.S. at 82, 130 S.Ct. 2011, 176 L.Ed.2d 825.
{¶ 63} It is consistent with Graham to conclude that a term-of-years prison sentence extending beyond a juvenile defendant’s life expectancy does not provide a realistic opportunity to obtain release before the end of the term. Graham decried the fact that the defendant in that case would have no opportunity to obtain release “even if he spends the next half century attempting to atone for his crimes and learn from his mistakes.” Id. at 79. Certainly, the court envisioned that any nonhomicide juvenile offender would gain an opportunity to obtain release sooner than after three-quarters of a century in prison. Graham is less concerned about how many years an offender serves in the long term than it is about the offender having an opportunity to seek release while it is still meaningful.
{¶ 64} We determine that pursuant to Graham, a sentence that results in a juvenile defendant serving 77 years before a court could for the first time consider based on demonstrated maturity and rehabilitation whether that defen *573 dant could obtain release does not provide the defendant a meaningful opportunity to' reenter society and is therefore unconstitutional under the Eighth Amendment.

Multiple Offenses

{¶ 65} The state also argues that Graham does not extend to juveniles sentenced to lengthy prison terms consisting of multiple, consecutive fixed-term sentences for nonhomicide offenses. The state argues that in Graham, the court simply held that the Eighth Amendment forbids the sentence of life imprisonment without parole for juvenile offenders who commit a single nonhomicide offense. We reject that argument.
{¶ 66} We note at the outset that the defendant in Graham had committed multiple offenses. When Graham was 16 years old, he and an accomplice entered a restaurant at closing time with the intent to rob it; the accomplice hit the restaurant manager in the back of the head with a metal bar, causing a head injury that required stitches. Graham was charged as an adult with armed burglary with assault or battery, a first-degree felony carrying a maximum penalty of life imprisonment without the possibility of parole, and attempted armed robbery, a second-degree felony carrying a maximum penalty of 15 years’ imprisonment. He pleaded guilty to both charges under a plea agreement. The trial court withheld adjudication of guilt and sentenced Graham to three years’ probation, the first year of which had to be spent in the county jail. Graham, 560 U.S. at 53-54, 130 S.Ct. 2011, 176 L.Ed.2d 825.
{¶ 67} Less than six months after his release from jail, Graham was involved in an armed home-invasion robbery. Later that same evening, he and his accomplices attempted another home invasion, and an accomplice was shot. Graham later admitted to police that he had been involved in two or three other robberies before that night. Id. at 54-55.
{¶ 68} The trial court found that Graham had violated his probation by committing a home-invasion robbery, by possessing a firearm, and by associating with persons engaged in criminal activity. Id. at 55. Citing an “escalating pattern of criminal conduct” and a desire to protect the community, the trial court sentenced Graham to the maximum sentence on each of the two original charges—life on the first charge and 15 years on the second. Id. at 57.
{¶ 69} The Supreme Court in Graham acknowledged that Graham committed serious crimes early on in his period of supervised release, “posed an immediate risk,” and deserved to be separated from society “in order to prevent what the trial court described as an ‘escalating pattern of criminal conduct.’ ” Id. at 73. In full recognition of the multiple crimes that Graham committed, the court conclud *574 ed, however, that “it does not follow that he would be a risk to society for the rest of his life.” Id. The nature or number of the crimes he committed was less important than who he was at the time he committed them: a juvenile whose age, coupled with his commission of nonhomicide crimes, left him with “limited moral culpability” such that he could not be condemned at the outset to a lifetime of imprisonment without any hope for release. Id. at 74.
{¶ 70} The court created “a clear line * * * necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment.” Id. Graham enunciated “a categorical rule [that] gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform.” Id. at 79. It did not limit that holding to juveniles who were sentenced for only one offense.
{¶ 71} Instead, the protections in Graham apply to juveniles who do not commit homicide. Moore fits that description. The court specifically rejected a case-by-case approach that would have required courts “to take the offender’s age into consideration as part of a case-specific gross disproportionality inquiry, weighing it against the seriousness of the crime.” Id. at 77. The court admitted that “[t]his approach would allow courts to account for factual differences between cases and to impose life without parole sentences for particularly heinous crimes.” Id.
{¶ 72} In adopting a categorical approach, the court specifically rejected proportionality review on a case-by-case basis because “it does not follow that courts taking a case-by-case proportionality approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change.” Id. The court in Roper had held that simply considering youth as a mitigating factor was insufficient because of an “unacceptable likelihood * * * that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender’s objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death.” Roper, 543 U.S. at 573, 125 S.Ct. 1183, 161 L.Ed.2d 1. The Graham court instructed that the same is the case with life-without-parole sentences: “Here, as with the death penalty, ‘[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive’ a sentence of life without parole for a nonhomicide crime ‘despite insufficient culpability.’ ” Graham, 560 U.S. at 78, 130 S.Ct. 2011, 176 L.Ed.2d 825, quoting Roper at 572-573.
*575 {¶ 73} “[N]one of what [Graham] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific.” Miller, 567 U.S. at 473, 132 S.Ct. 2455, 183 L.Ed.2d 407. Whether the sentence is the product of a discrete offense or multiple offenses, the fact remains that it was a juvenile who committed the one offense or several offenses and who has diminished moral culpability. To suggest that a life-without-parole sentence would be permissible for a juvenile who committed multiple offenses would be to ignore the categorical restriction against that penalty for juveniles who do not commit homicide. A court cannot impose a sentence that is barred because of the identity of the offender on the ground that the offender committed multiple crimes. As an adult offender who commits multiple, nonhomicide offenses cannot become eligible for the death penalty, neither can a juvenile offender become eligible for the most severe penalty permissible for juveniles by committing multiple nonhomicide offenses. The number of offenses committed cannot overshadow the fact that it is a child who has committed them.
{¶ 74} We conclude that the Eighth Amendment prohibition of life imprisonment without parole or its practical equivalent for juvenile offenders is not limited to juveniles who commit a single nonhomicide offense.

Consistency with Other States

{¶ 75} Our holding is consistent with those of other high courts that have held that for purposes of applying the Eighth Amendment protections set forth in Graham and Miller, there is no meaningful distinction between sentences of life imprisonment without parole and prison sentences that extend beyond a juvenile’s life expectancy.
{¶ 76} In People v. Caballero, 55 Cal.4th 262, 268-269, 145 Cal.Rptr.3d 286, 282 P.3d 291 (2012), the California Supreme Court held that “sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender’s natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment.” The defendant in that case had been convicted of multiple counts of attempted murder and would become eligible for parole only after serving 110 years. The court stated that “Graham’s analysis does not focus on the precise sentence meted out. Instead, * * * it holds that a state must provide a juvenile offender ‘with some realistic opportunity to obtain release’ from prison during his or her expected lifetime.” Caballero at 268, quoting Graham, 560 U.S. at 82, 130 S.Ct. 2011, 176 L.Ed.2d 825.
{¶ 77} In Henry v. State, 175 So.3d 675 (Fla.2015), the Florida Supreme Court declared unconstitutional a term-of-years sentence imposed on a nonhomicide offender. The defendant in Henry had been sentenced to an aggregate sentence of 90 years, with mandatory prison time until he reached age 95. The court *576 declared that sentence unconstitutional pursuant to Graham. The court pointed out that the specific term or terminology of the sentence is not determinative as to whether the sentence violates the Eighth Amendment:
Thus, we believe that the Graham Court had no intention of limiting its new categorical rule to sentences denominated under the exclusive term of “life in prison.” Instead, we have determined that Graham applies to ensure that juvenile nonhomicide offenders will not be sentenced to terms of imprisonment without affording them a meaningful opportunity for early release based on a demonstration of maturity and rehabilitation.
Henry at 679-680, citing Graham at 75.
{¶ 78} Henry held that the Constitution requires a mechanism for review of lengthy sentences given to juvenile offenders:
In light of Graham, and other Supreme Court precedent, we conclude that the Eighth Amendment will not tolerate prison sentences that lack a review mechanism for evaluating this special class of offenders for demonstrable maturity and reform in the future because any term of imprisonment for a juvenile is qualitatively different than a comparable period of incarceration is for an adult.
Henry at 680.
{¶ 79} In State ex rel. Morgan v. State, 217 So.3d 266, 2016 WL 6125428 (La.2016), the Supreme Court of Louisiana addressed a sentence of “99 years [of] imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence” imposed on a defendant who had committed armed robbery at age 17. Id. at 268. The court held that “the categorical rule in Graham applies to the defendant’s 99-year sentence without parole insofar as it is the functional equivalent of a life sentence and denies him a meaningful opportunity for release, to which he is entitled.” Id. at 276-277.
{¶ 80} The Iowa Supreme Court in State v. Ragland, 836 N.W.2d 107 (Iowa 2013), and State v. Null, 836 N.W.2d 41 (Iowa 2013), held that the constitutional infirmities of life-without-parole sentences for juveniles could not be overcome simply by imposing lengthy term-of-years sentences. Ragland dealt with a murder defendant who was sentenced to 60 years in prison; the defendant was 18 years old at the time of his imprisonment, and the sentence took him to the edge of his life expectancy. Ragland at 119. The court in Ragland, noting that “it is *577 important that the spirit of the law not be lost in the application of the law,” wrote:
The spirit of the, constitutional mandates of Miller and Graham instruct that much more is at stake in the sentencing of juveniles than merely-making sure that parole is possible. In light of our increased understanding of the decision making of youths, the sentencing process must be tailored to account in a meaningful way for the attributes of juveniles that are distinct from adult conduct. At the core of all of this also lies the profound sense of what a person loses by beginning to serve a lifetime of incarceration as a youth.
Ragland at 121. Ragland held that Miller’s requirement of individualized sentencing consideration for youths facing life-without-parole sentences also “applies to sentences that are the functional equivalent of life without parole.” Ragland at 121-122.
{¶ 81} In Null, another murder case, the court addressed the defendant’s minimum sentence of 52.5 years. The court stated that “[e]ven if lesser sentences than life without parole might be less problematic, we do not regard the juvenile’s potential future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of Graham or Miller.” Null at 71. The court recognized that the likelihood of simply surviving a sentence does not provide the protection to juvenile offenders envisioned by Graham: “The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a ‘meaningful opportunity’ to demonstrate the ‘maturity and rehabilitation’ required to obtain release and reenter society as required by Graham, 560 U.S. at [75], 130 S.Ct. at 2030, 176 L.Ed.2d at 845-46.” Null at 71.
{¶ 82} Moreover, Null made clear that courts should not undertake fine line-drawing to determine how close to the mark a sentencing court can come to a defendant’s life expectancy: “[W]e do not believe the determination of whether the principles of Miller or Graham apply in a given case should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates.” Null at 71. The important factor, instead, is the recognition that children have lessened moral culpability and are redeemable and so must be given a chance to demonstrate the change they have undergone since committing their crimes:
In coming to this conclusion, we note the repeated emphasis of the Supreme Court in Roper, Graham, and Miller of the lessened culpability of juvenile offenders, how difficult it is to determine which juvenile *578 offender is one of the very few that is irredeemable, and the importance of a “meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.” Graham, 560 U.S. at [75], 130 S.Ct. at 2030, 176 L.Ed.2d at 845-46. We also note that in the flurry of legislative action that has taken place in the wake of Graham and Miller, many of the new statutes have allowed parole eligibility for juveniles sentenced to long prison terms for homicides to begin after fifteen or twenty-five years of incarceration.
Null at 71-72.
{¶ 83} Similarly, the Wyoming Supreme Court has held that “a lengthy aggregate sentence for closely-related crimes whose practical effect is that the juvenile offender will spend his lifetime in prison triggers the Eighth Amendment protections set forth by the United States Supreme Court in Miller.” Bear Cloud v. State, 2014 WY 113, 334 P.3d 132, ¶ 32. The defendant in Bear Cloud had been convicted of murder and aggravated burglary and sentenced to a term of 45 years. The court concluded,
The United States Supreme Court’s Eighth Amendment jurisprudence requires that a process be followed before we make the judgment that juvenile “offenders never will be fit to reenter society.” Graham, 560 U.S. at 75, 130 S.Ct. at 2030. That process must be applied to the entire sentencing package, when the sentence is life without parole, or when aggregate sentences result in the functional equivalent of life without parole.
Bear Cloud at ¶ 37.
{¶ 84} In Casiano v. Commr. of Corr., 317 Conn. 52, 115 A.3d 1031 (2015), the Supreme Court of Connecticut held that the defendant’s 50-year sentence fell within Miller’s mandate of individualized sentencing for juvenile homicide offenders:
A juvenile offender is typically put behind bars before he has had the chance to exercise the rights and responsibilities of adulthood, such as establishing a career, marrying, raising a family, or voting. Even assuming the juvenile offender does live to be released, after a half century of incarceration, he will have irreparably lost the opportunity to engage meaningfully in many of these activities and will be left with seriously diminished prospects for his quality of life for the few years he has left. A *579 juvenile offender’s release when he is in his late sixties comes at an age when the law presumes that he no longer has productive employment prospects. * * *
The United States Supreme Court viewed the concept of “life” in Miller and Graham more broadly than biological survival; it implicitly endorsed the notion that an individual is effectively incarcerated for “life” if he will have no opportunity to truly reenter society or have any meaningful life outside of prison.
Casiano at 78. Thus, the court held that the imposition of a 50-year sentence— like the life-without-parole sentence in Miller—required the trial court to “engage in an individualized sentencing process that accounts for the mitigating circumstances of youth and its attendant characteristics.” Casiano at 59.
{¶ 85} In People v. Reyes, 2016 IL 119271, 407 Ill.Dec. 452, 68 N.E.3d 884, the defendant was sentenced to a 97-year prison term for the first-degree murder and two attempted murders he committed when he was 16 years old; he was required to serve at least 89 years of his sentence. Id. at ¶ 2. The Supreme Court of Illinois held that the mandatory, functional equivalent of a life sentence was unconstitutional pursuant to Miller:
A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant’s life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. Miller makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation. * * * Accordingly, we hold that sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment.
Reyes at ¶ 9.
{¶ 86} We agree with these other state high courts that have held that for purposes of applying the Eighth Amendment protections discussed in Graham and Miller, there is no distinction between life-without-parole sentences for juveniles and term-of-years sentences that leave a juvenile offender without a meaningful opportunity to demonstrate rehabilitation and growth leading to possible early release within the juvenile offender’s expected lifespan.
*580 {¶ 87} We note also that most of these cases from other state supreme courts involved juveniles who had been convicted of multiple offenses. The defendants in both Caballero and Henry were sentenced for committing multiple offenses, and both courts held that the functional life sentences imposed on them violated the Eighth Amendment pursuant to Graham. Caballero had been convicted of three counts of attempted murder, Caballero, 55 Cal.4th at 265, 145 Cal.Rptr.3d 286, 282 P.3d 291, and Henry had been convicted of three counts of sexual battery with a deadly weapon or physical force, one count of kidnapping with intent to commit a felony (with a firearm), two counts of robbery, one count of carjacking, one count of burglary of a dwelling, and one count of possession of 20 grams or less of cannabis, Henry v. State, 82 So.3d 1084, 1085 (Fla.App.2012), quashed, 175 So.3d 675 (Fla.2015). Likewise, in Bear Cloud, Null, Casiano, and Reyes, the courts held that the protections of Miller applied in cases in which the defendants had been convicted of murder and of other offenses; Bear Cloud was sentenced for first-degree murder, aggravated burglary, and conspiracy to commit aggravated burglary, Bear Cloud, 2014 WY 113, 334 P.3d 132, at ¶ 1, Null was sentenced for second-degree murder and first-degree robbery, Null, 836 N.W.2d at 45, Casiano was convicted of felony murder, attempted robbery, and conspiracy to commit robbery, Casiano, 317 Conn. at 55, 115 A.3d 1031, and Reyes was sentenced for first-degree murder and two counts of attempted murder, Reyes, 2016 IL 119271, 407 Ill.Dec. 452, 63 N.E.3d 884, at ¶ 2.
Procedure
{¶ 88} Graham’s prohibition on sentences of life imprisonment without parole for juvenile nonhomicide offenders also applies to prison sentences that are the functional equivalent of life sentences. But is Moore procedurally able to gain the protection of the Eighth Amendment at this stage of his proceedings? He asks this court to overturn the court of appeals’ refusal to grant reconsideration of its March 24, 2009 decision affirming his 112-year sentence. Graham was decided on May 17, 2010. Moore filed his application for reconsideration on September 16, 2013.
{¶ 89} App.R. 26(A)(1) allows parties ten days to move an appellate court for reconsideration of a decision: “Application for reconsideration of any cause or motion submitted on appeal shall be made in writing no later than ten days after the clerk has both mailed to the parties the judgment or order in question and made a note on the docket of the mailing as required by App.R. 30(A).” But under App.R. 14(B), the appellate court may expand or contract any time period set forth in the Appellate Rules, and the rule specifically allows a court to extend the time period for seeking reconsideration “on a showing of extraordinary circumstances.” App.R. 14(B) reads:
*581 For good cause shown, the court, upon motion, may enlarge or reduce the time prescribed by these rules or by its order for doing any act, or may permit an act to be done after the expiration of the prescribed time. * * * Enlargement of time to file an application for reconsideration or for en banc consideration pursuant to App.R. 26(A) shall not be granted except on a showing of extraordinary circumstances.
{¶ 90} Thus, the court below had the authority to grant Moore an extension of time to file his application for reconsideration if he showed “extraordinary circumstances.” Ohio appellate courts have granted applications for delayed reconsideration well over a year after the issuance of the original decision, citing subsequent decisions of this court as providing the required extraordinary circumstances. See, e.g., State v. Finley, 1st Dist. Hamilton No. C-061052, 2010-Ohio-5203, 2010 WL 4243406, ¶ 6 (reconsideration granted over two years after original decision); State v. Gandy, 1st Dist. Hamilton No. C-070152, 2010-Ohio-2873, 2010 WL 2543911, ¶ 8 (reconsideration granted 20 months after original decision); Lyttle v. Ohio, 12th Dist. Butler No. CA2010-04-089, 2012-Ohio-3042, 2012 WL 2520466, ¶ 5 (reconsideration granted over 18 months after original decision).
{¶ 91} The court below denied Moore’s application for reconsideration based on its earlier decisions in Bunch, 7th Dist. Mahoning No. 06 MA 106, and Barnette, 7th Dist. Mahoning No. 06 MA 135. The court cited identical reasons for denying applications for reconsideration in Bunch and Barnette; both cases are inapplicable here.
{¶ 92} First, the court in Bunch and Barnette relied in part on the three-year lag time in both cases between the announcement of Graham and the filing of the application for reconsideration in state court. In Bunch, the court noted that Bunch had promptly raised Graham in his federal appeals but not in Ohio courts. The court wrote, “Had the application and motion been filed more closely in time to the Graham decision it could support a finding of extraordinary circumstances.” Bunch at 3.
{¶ 93} Moore, on the other hand, first attempted to raise Graham in Ohio courts on the same day Graham was decided. He filed a notice of appeal from the trial court’s April 20, 2010 nunc pro tunc sentencing entry on May 17, 2010, the same day Graham was announced; in his merit brief—filed in December 2010 after he had procured appointed counsel—he raised the issue that Graham prohibited his lengthy sentence. That appeal was not dismissed until November 2011. Despite the fact that the court dismissed the appeal for lack of a final, appealable order, the court added in dicta that Moore’s Graham-based argument was “barred in this case by the doctrine of res judicata” and “is one more *582 properly raised in a petition for postconviction relief.” Moore V, 7th Dist. Mahoning No. 10-MA-85, 2011-Ohio-6220, 2011 WL 6017942, at ¶ 33.
{¶ 94} So, unlike the appellants in Bunch and Barnette, Moore did attempt to raise Graham in state court contemporaneously with its release but was discouraged from pursuing relief on that basis in dicta by the court of appeals. Once Moore obtained new counsel, however, in September 2013, he filed an application for reconsideration raising Graham just over a month later.
{¶ 95} Even so, the delay in filing was the less significant reason cited by the court for rejecting the applications for reconsideration in Bunch and Barnette. The court in both cases wrote that the more important reason was that “when appellate courts have found extraordinary circumstances based on binding decisions from higher courts, they have done so when the higher court’s case is directly on point,” Bunch at 3, citing State v. Lawson, 2013-Ohio-803, 984 N.E.2d 1126, ¶ 6 (10th Dist.), State v. Truitt, 1st Dist. Hamilton No. C-050188, 2011-Ohio-1885, 2011 WL 1485456, ¶ 3, and State v. Thomas, 1st Dist. Hamilton No. C-010724, 2009-Ohio-971, 2009 WL 565511, ¶ 5; Barnette at 3 (same). The court reasoned that because Graham and Miller were not directly on point, those cases did not demonstrate any obvious error in the appellate court’s decision and, therefore, that the requisite finding of extraordinary circumstances warranting the enlargement of the time for filing an application for reconsideration was missing.
{¶ 96} For the reasons discussed above, we have established that Moore’s case is controlled by Graham and that there is no meaningful distinction between the two cases. A defendant convicted of crimes he committed as a juvenile cannot at the outset be sentenced to a lifetime in prison—whether labeled “life in prison without parole” or consisting of a term of years extending beyond the defendant’s life expectancy—without having a meaningful opportunity to establish maturity and rehabilitation justifying release.
{¶ 97} Generally, a new decision does not apply to convictions that were final when the decision was announced. But “courts must give retroactive effect to new substantive rules of constitutional law. Substantive rules include * * * ‘rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.’ ” Montgomery, — U.S. -, 136 S.Ct. at 728, 193 L.Ed.2d 599, quoting Penny v. Lynaugh, 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Graham prohibits life-without-parole sentences or their equivalents for juveniles.
{¶ 98} In Montgomery, the court held that “when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral-review courts to give retroactive effect to that rule.” Id. at —, 136 S.Ct. at 729. Specifically, Montgomery involved the application of the court’s *583 decision in Miller prohibiting the automatic imposition of a life-without-parole sentence on a defendant who had committed a homicide as a juvenile. The court found that “Miller announced a substantive rule of constitutional law.” Montgomery at —, 136 S.Ct. at 734. In doing so, it recognized that “Miller is no less substantive than are Roper and Graham.” Montgomery at —, 136 S.Ct. at 734.
{¶ 99} This court has applied an abuse-of-discretion standard in reviewing an appellate court’s decision regarding an application for reconsideration. Reichert v. Ingersoll, 18 Ohio St.3d 220, 224, 480 N.E.2d 802 (1985). In this case, we hold that the court of appeals abused its discretion in not granting Moore’s application for reconsideration concerning his unconstitutional sentence. Extraordinary circumstances warranted the request for delayed reconsideration—the on-point, substantive, retroactive United States Supreme Court decision in Graham.
CONCLUSION
{¶ 100} We hold in this case that Graham’s categorical prohibition of sentences of life imprisonment without the possibility of parole for juveniles who commit nonhomicide crimes applies to juvenile nonhomicide offenders who are sentenced to term-of-years sentences that exceed their life expectancies. The court of appeals abused its discretion in failing to grant Moore’s application for reconsideration. The 112-year sentence the trial court imposed on Moore violates the Eighth Amendment’s prohibition against cruel and unusual punishments. We reverse the judgment of the court of appeals and vacate Moore’s sentence, and we remand the cause to the trial court for resentencing in conformity with Graham.
Judgment reversed and cause remanded.
O’Neill, J., concurs.
O’Connor, C.J., concurs, with an opinion.
Lanzinger, J., concurs, with an opinion.
Kennedy, J., dissents, with an opinion joined by O’Donnell, J.
French, J., dissents, with an opinion.