OPINION
{¶ 1} Appellant, Dujuan Lamont Adams, timely appealed his two, first-degree felony attempted murder convictions and firearm specifications rendered on August 28, 2000, in the Mahoning County Court of Common Pleas. This Court subsequently dismissed his appeal for failure to prosecute. App.R. 18(C). Thereafter, we granted Appellant's delayed application for reopening his appeal on April 22, 2005.
 {¶ 2} The convictions stem from a drug deal that occurred on the evening of January 8, 2000. According to the victims, Appellant was short $40 for his marijuana buy. With the drugs in his possession, he had his dealer, Kendall Lovejoy, and an acquaintance, Greg Brown, drive him to his grandmother's house. Once they arrived, Appellant shot Brown in the eye. Lovejoy tried to wrestle the gun from Appellant and flee, but Appellant shot him in the hand and foot. According to Appellant, however, Lovejoy had the gun and was the aggressor and Appellant was the victim.
 {¶ 3} Appellant asserts four assignments of error on appeal. For the following reasons, Appellant's assignments of error are overruled in part and sustained in part. Appellant's sentence is vacated and this cause is remanded for resentencing.
 {¶ 4} We will review Appellant's second assignment of error first, since it addresses the underlying facts of the offenses and the weight of the evidence. In this assignment, Appellant claims:
 {¶ 5} "In violation of due process, the guilty verdicts were entered against the manifest weight of the evidence. (Tr. 681-82; August 23, 2000 Journal Entry)."
 {¶ 6} An appellate court should only invoke its discretionary power to reverse a conviction as against the manifest weight of the evidence in extraordinary circumstances when the evidence weighs heavily in the defendant's favor. State v. Otten (1986),33 Ohio App.3d 339, 340, 515 N.E.2d 1009.
 {¶ 7} "In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id.
 {¶ 8} The jury found Appellant guilty of two, first-degree felony attempted murder charges in violation of R.C. §§2923.02(A)(E) and 2903.02(A)(D). Both offenses had attendant firearm specifications. R.C. § 2941.145(A).
 {¶ 9} R.C. § 2903.02(A), which addresses a murder charge, prohibits an individual from purposely causing the death of another. Appellant was convicted of attempted murder. Attempt is defined in R.C. § 2923.02(A),
 {¶ 10} "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."
 {¶ 11} Appellant argues on appeal that his two attempted murder convictions were against the manifest weight of the evidence. This argument is based on the fact that his victims gave several different versions of the incident in question to the police before providing their final versions at trial. Lovejoy and Brown were the main witnesses against Appellant.
 {¶ 12} Kendall Lovejoy testified that he was selling marijuana to Appellant on the evening of the shooting. Lovejoy was driving his vehicle; Greg Brown was in the front passenger's seat. According to Lovejoy, Appellant entered the backseat of his car for the transaction. Appellant initially told Lovejoy that he wanted to buy a quarter pound of marijuana. Appellant watched Lovejoy weigh three ounces of marijuana, and he showed him another two ounces as well. Lovejoy handed Appellant one ounce of marijuana, but Appellant only had $80. He owed Lovejoy another $40. Appellant went back inside his residence to get more money. On his return, another car had pulled up and was blocking Lovejoy's vehicle. The men felt threatened, so Appellant told Lovejoy to drive them several blocks away to what he said was his grandmother's house to complete the transaction. (Tr., pp. 263-264, 268, 293, 307.)
 {¶ 13} Upon arriving at Appellant's grandmother's house, Lovejoy's cellular telephone rang. He answered his telephone, and he heard a "pow." Lovejoy looked over and saw that Brown, who had been in the front passenger's seat, was gone. Lovejoy's ears were ringing and he could smell that a gun had been fired. Appellant was still in the back seat and he had a gun in his hand. (Tr., pp. 268-270.)
 {¶ 14} Lovejoy grabbed at Appellant's gun and dropped his cellular phone. The gun discharged, and Lovejoy hit Appellant. Lovejoy was shot in the left hand at some point during this struggle. Appellant got out of the backseat and pointed the gun in Lovejoy's face through the driver's side window. Lovejoy ducked and dove out of the passenger's side door, which was still open. (Tr., pp. 271-273.)
 {¶ 15} As Lovejoy ran from his car, he saw Appellant coming toward him with the gun. He heard more gunshots and his foot began hurting, so he hid under some bushes. He discovered that he had been shot in the heel of his right foot. Lovejoy subsequently saw his car being driven away. (Tr., pp. 274, 283.)
 {¶ 16} As Appellant points out, Lovejoy originally gave another version of the facts surrounding the incident. Lovejoy initially told the investigating police officer that he was injured by a hitchhiker who stole his car at gunpoint. Lovejoy then told this same story to a detective. (Tr., pp. 285-286, 288.)
 {¶ 17} However, Lovejoy eventually implicated Appellant and told the Youngstown Police Department about the drug deal gone bad. Lovejoy explained to the jury that he was lying at first to protect himself. He was on federal parole at the time from a North Carolina conviction for the distribution of cocaine. Lovejoy indicated that he decided to tell the truth about this incident when he learned of the severity of Brown's injuries. (Tr., pp. 286, 298, 310.)
 {¶ 18} Greg Brown also testified for the state. He stated that Lovejoy was dating his aunt at the time, and so he decided to go with Lovejoy for a ride on the day of the incident. (Tr., pp. 344-345.)
 {¶ 19} Brown testified that Appellant entered the backseat of Lovejoy's car for a marijuana transaction. Brown knew Appellant very well. Brown was in the front seat when a shot was unexpectedly fired from the backseat and Brown was shot in the eye. Brown ran, and eventually Appellant chased him through several yards. Appellant caught up with him and choked and pistol-whipped him in the face until he played dead. Appellant went through Brown's pockets, checked his wrist, and ripped the chain from his neck. (Tr., pp. 356-361.)
 {¶ 20} Brown was eventually transported to the hospital. His jaw was broken, and he lost his left eye. (Tr., pp. 362, 378.)
 {¶ 21} Brown explained to the jury that he believed Appellant felt he had to kill him in order to cover up his crime. This was based on the fact that Brown knew Appellant so well from childhood. (Tr., p. 360.)
 {¶ 22} Brown also admitted at trial that he initially lied to the police about the incident. Brown first told the police that Appellant robbed them, but he did not mention the involvement of drugs. Brown then told the police the whole story the second time he spoke with them. He said he was afraid to tell the police about the drugs because he thought he would get into trouble. (Tr., pp. 363-364, 366, 375.)
 {¶ 23} Derrick Willis also testified for the state. Willis is Brown's cousin, and is the individual who called Lovejoy's cellular telephone just prior to the shooting. Willis testified that he heard a gunshot after Lovejoy answered the telephone. (Tr., p. 407.)
 {¶ 24} Youngstown Police Detective Daryl Martin testified that both Lovejoy and Brown identified Appellant in photo spreads as the shooter. (Tr., p. 449.) Martin also stated that Lovejoy's car was later found burned, and that there was a cellular telephone melted to the floor. It was open, "like somebody had been on it * * *." (Tr., p. 450.)
 {¶ 25} Appellant's testimony presents a very different version of the events. Appellant testified that he was the victim and that Lovejoy robbed him. He stated that Lovejoy knew Appellant had about $500 on his person since he was supposed to buy a quarter pound of marijuana. Appellant also said that he had been smoking marijuana all day. Upon entering Lovejoy's car, Appellant says he gave Lovejoy $500. He claims Lovejoy drove away with him in the car since they felt threatened where they were. (Tr., pp. 510-512.)
 {¶ 26} According to Appellant, Lovejoy then pulled a gun on him. They struggled for the gun and it discharged. Brown got out of the car and ran. Lovejoy and Appellant continued to struggle for the gun and it discharged several more times. Lovejoy then said "ouch," jumped out of the car and ran through some back yards. (Tr., p. 512.)
 {¶ 27} Appellant claims that in this altercation, Lovejoy took his $500 and that he only got one ounce of marijuana in exchange. (Tr., p. 514.)
 {¶ 28} Notwithstanding Appellant's testimony, his convictions are not against the manifest weight of the evidence. While there are conflicting versions of the incident, the jury is free to believe or disbelieve any witness. Brown's testimony alone, if believed, can establish that Appellant purposely attempted to kill him. Appellant shot Brown in the face, beat him in the face with his gun, and choked him. Appellant finally left Brown alone when he pretended to be dead. Based on the foregoing, Appellant's attempted murder conviction and firearm specification as to Brown were supported by the evidence presented.
 {¶ 29} The evidence also supports Appellant's conviction for the attempted murder of Lovejoy. Lovejoy testified that he was shot by Appellant during their struggle. Appellant subsequently aimed the gun in his face, but Lovejoy fled. Appellant again fired his gun while Lovejoy was running away, and Lovejoy was shot in the foot. Again, this testimony, if believed, fully supports the charge. Thus, Appellant's attempted murder conviction as to Lovejoy was not against the manifest weight of the evidence.
 {¶ 30} Further, there is no indication that the trier of fact clearly lost its way in believing Lovejoy's and Brown's version of the incident instead of Appellant's version. The jury could obviously believe Appellant had cause to lie, and there was no other evidence supporting his version of the shooting.
 {¶ 31} Appellant also claims that Lovejoy's explanation of the struggle over the gun is not credible because Lovejoy testified that he reached for Appellant's gun with his left hand. This was also the hand in which Lovejoy was holding his cellular telephone. Further, Lovejoy said that he did not drop his phone until after he felt pain in his hand. (Tr., pp. 271, 323.) However, Appellant was in the middle of the backseat at the time. (Tr., p. 321.) The jury could believe that Lovejoy grabbed at the gun with his left hand so that he could turn to see where he was reaching. The fact that he reached with the hand holding his telephone appears to be of no consequence.
 {¶ 32} Appellant also takes issue with conflicting testimony concerning the time of the shooting. Lovejoy testified that he was injured at 8:50 p.m. Other evidence reveals that an officer was dispatched to the shooting at 8:08 p.m. Further, the paramedic testified that she picked Brown up at 8:25 p.m. (Tr., pp. 249, 417, 485.)
 {¶ 33} As Appellant points out, Lovejoy's testimony as to the time of the shooting does not correspond with the other testimony. However, it is not inconceivable that Lovejoy's attention was elsewhere during the shooting. He was shot twice. Thus, the fact that he testified that he was injured forty minutes later than the time that the police were dispatched to the scene does not significantly undermine Lovejoy's credibility.
 {¶ 34} In this same vein, Appellant points out that Brown testified he was not picked up by the paramedics until about two hours after he was shot, however, the paramedic testified that Brown's wounds appeared to be fresh; not two hours old when she arrived. (Tr., pp. 371-372, 427-431.)
 {¶ 35} This inconsistency also does not seriously undermine Brown's credibility or negate the fact that Brown identified Appellant as his assailant. One can certainly understand how an individual shot in the eye and with a broken jaw could be mistaken about the time he was shot and the time he received treatment.
 {¶ 36} Upon a review of the record, we must determine that the verdict was not against the manifest weight of the evidence. Lovejoy and Brown's testimony supports the convictions, and the jury clearly believed their version of the incident and not Appellant's. Thus, this assignment of error lacks merit and is overruled.
 {¶ 37} Returning to Appellant's first assignment of error, Appellant claims:
 {¶ 38} "The trial court erred when it allowed Derrick Willis to testify when his name had not been provided to Mr. Adams during discovery and the unfair prejudice caused by allowing his testimony substantially outweighed its probative value. (Tr. 287-304)."
 {¶ 39} Crim.R. 16(E)(3) provides various remedies to be applied when a party fails to provide the requisite discoverable information. In such a case, the trial court, "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(E)(3).
 {¶ 40} Appellate courts review allegations of noncompliance with criminal discovery rules under the abuse of discretion standard. State v. Parson (1983), 6 Ohio St.3d 442, 445,453 N.E.2d 689. The Ohio Supreme Court in Parson, supra, identified three factors to be used in analyzing noncompliance by the state. First, a court should consider whether the record reveals that the state intentionally failed to disclose certain evidence. Second, a court should assess whether the defendant can demonstrate how advanced knowledge of the undisclosed evidence would have benefited his defense. Third, a court should determine whether a defendant can demonstrate that he was prejudiced as a result of the delay in the disclosure. Id.
 {¶ 41} Appellant in the instant matter claims the state intentionally failed to disclose Derrick Willis as a witness until the middle of trial. Appellant objected to Willis' testimony at trial, but the objection was overruled, and the court allowed his testimony.
 {¶ 42} Appellant claims that the advance knowledge of this undisclosed witness would have benefited his defense. Specifically, Appellant's counsel did not seek an order separating the witnesses. As a result, Willis sat through both Brown and Lovejoy's testimony before he testified. (Tr., p. 391.) Thus, Appellant argues that Willis could not help but corroborate the victims' version of the shooting.
 {¶ 43} Willis' testimony does corroborate a portion of Lovejoy's version of the incident. Lovejoy testified that he did not see Appellant shoot Brown because he was on his cell phone. Willis confirmed that he was on the phone with Lovejoy that night. Willis said he heard a gun shot over the phone. Thereafter, Lovejoy did not respond. (Tr., p. 407.) Willis' testimony also serves to contradict Appellant's statement that Lovejoy was the aggressor with the gun.
 {¶ 44} However, Appellant did not request a continuance at the time the evidence was admitted. Appellant's counsel only requested a criminal background check on Willis. Also, the record reflects that Appellant was aware of the nature of Willis' testimony before he testified. Thus, Appellant appears to have had an opportunity to counter the effect of Willis' testimony, if that was possible.
 {¶ 45} Further, there is nothing in the record reflecting that the state intentionally failed to disclose Willis as a witness. In fact, the prosecutor indicated and the trial court noted that the state did not learn of Willis' identity until the day of trial. It then promptly notified the defense that it intended to call Willis as a witness. (Tr., p. 395.)
 {¶ 46} Appellant argues that the state failed to fully investigate who Lovejoy was talking to on his cell phone. Appellant thus claims that the testimony should have been excluded based on the state's insufficient investigation in advance of trial.
 {¶ 47} Willis testified that he was never questioned by the police. (Tr., p. 412.) This was in spite of the fact that Detective Sergeant Martin testified that he found a cellular telephone melted to the floor in Lovejoy's car. Detective Sergeant Martin testified that he was under the impression that Lovejoy's phone had just rung and that, "there was no word spoken [over the telephone.] The phone just rang." (Tr., pp. 450, 468.) As such, the police investigation did not reveal Willis as a potential witness.
 {¶ 48} Appellant has not shown that the state was under any further obligation to investigate, nor has he shown any intentional acts on the part of the state. Based on the foregoing, the state did not fail to comply with its discovery requirements since it had no advance knowledge that Willis was the person making the call to Lovejoy at the time of the incident. This assignment of error lacks merit.
 {¶ 49} In Appellant's third assignment of error he asserts:
 {¶ 50} "The trial court erred by imposing separate, consecutive sentences for two firearm specifications when both specifications arose from the same act or transaction. (Tr. 710; Sent. Entry)."
 {¶ 51} Appellant was indicted on two counts of attempted murder with two accompanying firearm specifications pursuant to R.C. § 2941.145(A). Appellant now argues that pursuant to this Court's decision in State v. Moore, 161 Ohio App.3d 778,832 N.E.2d 85, 2005-Ohio-3311, the trial court erred in imposing consecutive sentences since the trial court used the "separate animus" test.
 {¶ 52} R.C. § 2929.14(D)(1)(a)(ii) imposes a mandatory three-year prison term when a defendant is convicted of a firearm specification pursuant to R.C. § 2941.145. However, a court is not authorized to impose more than one sentence for multiple firearm specifications if the specifications refer to the same criminal act or transaction: "A court shall not impose more than one prison term on an offender under division (D)(1)(a) of this section for felonies committed as part of the same act or transaction." R.C. § 2929.14(D)(1)(b).
 {¶ 53} This issue presents a mixed question of law and fact. We must uphold the trial court's factual findings unless they are clearly erroneous. However, "[a]ny purely legal issues, and the trial court's application of the law to the facts, are subject to de novo review." (Citations omitted.) Moore, supra, at ¶ 36.
 {¶ 54} As Appellant points out, this Court rejected the separate animus test in Moore, supra. We noted that in assessing multiple gun specifications, a court should focus on an individual's, "overall criminal objectives, not on the specific animus for each crime." Id. at ¶ 45. Whether a defendant had a common purpose in committing multiple crimes is a broader concept than animus. Id. at ¶ 46.
 {¶ 55} In Moore, the defendant robbed several individuals who were all in the same car, and the offense lasted approximately ninety seconds. Thus, we concluded that, "the factual context of the crime," warranted only one gun specification. Id. at ¶ 48.
 {¶ 56} In reaching this conclusion, we explained the distinction between a single criminal transaction and the separate animus test:
 {¶ 57} "`Transaction,' as used in the firearm specification statutes, has been defined as `a series of continuous acts bound together by time, space and purpose, and directed toward a single objective.' [In addition, o]ther courts have stated that a `transaction' is a `single criminal adventure.' * * *
 {¶ 58} "`Animus,' in contrast, has been described as `purpose, intent, or motive.' It has also been defined as `immediate motive.'" (Citations omitted.) Id. at ¶ 37, 38.
 {¶ 59} As previously indicated, Appellant claims the trial court erred in imposing two, consecutive firearm specification sentences in this case because the court applied the "separate animus" test. The trial court concluded:
 {¶ 60} "This was not a single act or transaction. Although it did all happen at approximately the same time, there was a completely separate animus and separate evil intended by this Defendant against each of these individual human beings, and these firearm specifications cannot logically or reasonably merge." (Sentencing Tr., p. 710.)
 {¶ 61} As Appellant points out, the trial court erred in its application of the separate animus test in the instant cause. Thus, we must review the correct application of the law to the facts de novo.
 {¶ 62} The facts in the instant matter do not present sufficient separate purposes to support the two gun specification sentences. As Appellant states, both attempted murders appear to be part of Appellant's overall plan to steal drugs from Lovejoy. In other words, both offenses were likely part of the same criminal transaction.
 {¶ 63} The evidence presented at trial established that Appellant's purpose on the night in question was to steal Lovejoy's marijuana. Appellant knew that Lovejoy possessed a quarter pound of marijuana based on their conversation earlier that day. In fact, Appellant initially told Lovejoy that he wanted to buy a quarter pound of the substance. Later that same day, Appellant had Lovejoy follow him to his house to get money for the transaction. Appellant watched Lovejoy weigh three separate ounces of marijuana. Lovejoy showed him two additional ounces. Lovejoy handed Appellant one ounce, but Appellant only gave Lovejoy $80, which was apparently not enough money to buy even that single ounce. (Tr., pp. 291-293.)
 {¶ 64} Appellant went into his home for money. When he came out, there were people in a nearby car acting in a threatening manner. The car had swerved toward Lovejoy's car and blocked it in. Appellant had Lovejoy drive him to his grandmother's house so they could complete the transaction. (Tr., pp. 268, 352.)
 {¶ 65} After arriving at this new destination, Appellant shot Brown in the eye, and Brown ran. Thereafter, Brown heard five more shots. During this time, Appellant and Lovejoy struggled for the gun, and Lovejoy was shot twice. Lovejoy also ran, and Appellant chased Brown and beat and choked him until Brown played dead before driving away in Lovejoy's car. (Tr., pp. 357-360.)
 {¶ 66} The record reflects that Brown knew Appellant well; whereas Lovejoy was from out of state. Thus, Appellant evidently felt compelled to kill Brown to cover up his robbery. Accordingly, both of Appellant's attempted murder convictions appear to stem from the same criminal transaction and both were directed at the same criminal purpose, i.e., to steal Lovejoy's marijuana.
 {¶ 67} Based on the foregoing, the trial court erred in imposing two gun specification prison terms. Accordingly, Appellant's sentence is vacated and the case is remanded for resentencing on this issue.
 {¶ 68} Appellant's fourth assignment of error states:
 {¶ 69} "The trial court erred by sentencing Mr. Adams to maximum, consecutive prison terms based on facts not found by the jury or admitted by Mr. Adams. (Tr. 707; Sent. Entry)."
 {¶ 70} Appellant claims that his sentence is illegal since he was sentenced to two, ten-year maximum sentences based on facts not found by the jury or admitted by him. This assignment of error is founded on the U.S. Supreme Court's decision in Blakelyv. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531.
 {¶ 71} Appellant argues that based on Blakely, supra, he should have been sentenced only to the minimum prison term. Specifically, Appellant claims that the trial court's sentencing findings in support of the maximum sentence are in violation ofBlakely. This is based on the fact that the sentencing court, and not the jury, determined that his was the worst form of the offense and that he posed the greatest likelihood of recidivism.
 {¶ 72} Since Appellant submitted his Blakely argument, the Ohio Supreme Court recently decided an Ohio case which raised this issue, State v. Foster, ___ Ohio St.3d ___, 2006-Ohio-856. In Foster, the Ohio Supreme Court held in part that R.C. §2929.14(C) is unconstitutional based on Blakely, supra, since it requires a sentencing court to render certain findings before it is authorized to impose the applicable maximum prison term.Foster at ¶ 63-64.
 {¶ 73} The Foster Court also held that R.C. § 2929.14(E)(4) is unconstitutional since it requires a sentencing court to make findings before imposing consecutive prison terms. Id. at ¶ 67.
 {¶ 74} Notwithstanding the foregoing, however, the Foster
Court also concluded that the unconstitutional sections in R.C. §§ 2929.14(C) and 2929.14(E)(4) are capable of being severed. Id. at paragraphs two and four of the syllabus. Subsequently, the very specific findings that were required by the stricken section are no longer mandated. While the trial court will continue to use its discretion in considering the sentencing factors set forth in R.C. §§ 2929.12 and 2929.13, the court is no longer required to enunciate specific findings to impose more than minimum sentences, or to impose maximum or consecutive sentences.
 {¶ 75} Based on the foregoing, Appellant's sentence in this case must be vacated and remanded for a resentencing hearing unless the parties stipulate to the prior sentencing record and allow the trial court to enter a sentence based on that record. Id. at ¶ 104-105.
 {¶ 76} In conclusion, Appellant's convictions are sustained, however, his sentence is vacated. This cause is remanded for resentencing according to law and consistent with this Court's Opinion.
Donofrio, P.J., concurs.
DeGenaro, J., concurs.