[Cite as *State v. Bunch*, 2024-Ohio-5040.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

CHAZ DIONYOUS BUNCH,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0067**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2001 CR 1024

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*, Atty. Ralph M. Rivera*, Chief, Criminal Division, and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Joseph C. Patituce and Atty. Megan M. Patituce,* Patituce & Associates, LLC, for Defendant-Appellant.

Dated:  October 18, 2024

**DICKEY, J.**

{¶1}    Appellant, Chaz Dionyous Bunch, appeals from the June 3, 2021 judgment of the Mahoning County Court of Common Pleas denying his first amended petition for post-conviction relief without a hearing.  On appeal, Appellant asserts his trial counsel rendered ineffective assistance at re-sentencing and alleges the trial court erred in failing to hold a hearing on his petition.  Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2}    This court extensively set forth the relevant facts and procedural history underlying this matter in Appellant's last appeal, *State v. Bunch*, 2021-Ohio-1244 (7th Dist.):

> On October 2, 2002, a jury found Appellant guilty of three counts of rape, three counts of complicity to rape, aggravated robbery, kidnapping, and eight firearm specifications. He was also convicted of aggravated menacing, a misdemeanor. *See State v. Bunch,* 7th Dist. No. 02CA196, 2005-Ohio-3309 (reversing a conviction for conspiracy to commit aggravated robbery, affirming remaining convictions, and remanding for resentencing on a maximum of three firearm specifications). Following the initial appeal, Appellant was sentenced to an aggregate sentence of 89 years in prison. *State v. Bunch,* 7th Dist. No. 06MA106, 2007-Ohio-7211. He received consecutive terms of ten years on each of the eight felonies, with the misdemeanor menacing count running concurrent, plus three years on each of the three firearm specifications. *State v. Bunch,* 7th Dist. No. 06MA106, 2007-Ohio-7211.

> The events leading to his indictment and convictions . . . are as follows:

> Early in the evening on August 21, 2001, Jason Cosa, Christine Hammond and Jason's grandfather were returning to Jason's home located at 190 Maywood, Youngstown, Ohio. (Tr. 808, 814). After they had entered

the driveway, a man wearing a mask (later admitted to being Brandon Moore), approached the car and robbed them at gunpoint. (Tr. 809-811, 826).

Neither Jason nor Christine could identify who the gunman was, but they did notice that he got into an awaiting vehicle that was a dark, older automobile. Both described the car as being dark and very loud. (Tr. 813, 829).

Later that night at approximately 10:20 p.m., M.K., a twenty-two year-old Youngstown State University student, arrived at a group home for mentally handicapped women to report to work for the evening; she worked the night shift. (Tr. 850, 854). The group home she worked at was located at 1322 Detroit Avenue, Youngstown, Ohio. (Tr. 855).

Upon arriving, she exited her vehicle and went to get her belongings out of the trunk of her car. (Tr. 855). On her way to the trunk, M.K. noticed an older, black automobile (referred to as black automobile) coming up the street and stopping a few houses away. (Tr. 862-863). At this point, she also saw a tall man running through the grass. (Tr. 863). The man wearing a mask, later identified as Brandon Moore, pointed a gun at her and instructed her to give him all her money and belongings. (Tr. 864). The porch light of the group home then came on and Moore instructed her to get into the passenger seat of her car. (Tr. 864). Moore climbed over M.K., positioned himself into the driver's seat, and drove away with her in the car. (Tr. 864).

Upon leaving the driveway, Moore, driving M.K.'s car, began following the black automobile. Shortly thereafter, Moore stopped the car and a second gunman exited the black automobile in front of them and entered the victim's car through the rear passenger's side door. (Tr. 870). The second gunman, later identified as Bunch, put a gun to her head and demanded her money and belongings. (Tr. 873). She now had two guns pointed at her, one from Moore and one from Bunch. (Tr. 874). After Bunch

had entered the vehicle, Moore began to drive and continued to follow the black automobile.

As all of this was occurring, Moore began to compliment M.K. on her beauty. Moore then, while driving, inserted his fingers into her vagina. (Tr. 876-877). Moore was so infatuated with her that he nearly hit the black automobile in front of them. (Tr. 877). It was at this point that M.K. was able to see the license plate of the black automobile. She memorized the license plate number as "CTJ6243." (Tr. 872). While all this was occurring, Bunch still had the gun pointed at her head.

At some point while Moore was driving, the black automobile stopped leading and began to follow Moore. Eventually, Moore drove down a dead-end street near Pyatt Street in Youngstown, Ohio, and both automobiles pulled into a gravel lot. (Tr. 879, 881, 1038-1039). Bunch ordered M.K. out of the car. (Tr. 884). Moore and Bunch then took turns orally raping her; one of them would have his penis in her mouth, while the other would force her head down. (Tr. 887-888). Guns were pointed at her while this was occurring. (Tr. 888).

After Moore and Bunch were finished orally raping her, they forced her at gunpoint to the trunk of the car. (Tr. 889). At the trunk of the car, she was anally raped. (Tr. 893). While this was occurring one of the individuals from the black automobile, who was later identified as Jamar Callier, went through her belongings in the trunk and took some of the items. (Tr. 890). The other individual in the black automobile stayed in the car the whole time and watched; he was later identified as Andre Bundy.

After the anal rape occurred, Bunch threw M.K. to the ground and then Moore and Bunch vaginally and orally raped her. (Tr. 895). While one of them vaginally raped her, the other would orally rape her, and then they would switch places. (Tr. 895-896). Both were armed as this occurred. (Tr. 895).

At some point while this was occurring, Bundy told Callier to stop what was going on. As a result, Callier pushed Bunch off M.K., helped her to her feet, and put her in her car. (Tr. 897, 1265-1266). This caused an altercation between Bunch and Callier. (Tr. 899). Bunch wanted to kill M.K., however, Callier told Bunch that he could not kill a pregnant woman. (Tr. 899). During the rapes, M.K. was pleading for her life and as part of that plea she claimed to be pregnant. (Tr. 893). Prior to her leaving, Moore and Bunch told her that they knew who she was and threatened to harm her and her family if she ever told what happened. (Tr. 900).

Once in her car, M.K. locked her doors and drove straight to her boyfriend's parents' house. While she was driving she kept repeating the license plate number of the car. (Tr. 902). Upon arriving at the house, the victim was hysterical, but she was able to scream out the license plate number, which someone wrote down. Her boyfriend's parents then immediately took her to the hospital. (Tr. 902). She arrived at the hospital at approximately 11:12 p.m. (Tr. 1029-1030).

At the hospital, her boyfriend's father immediately told Officer Lynch from the Youngstown Police Department that M.K. had been raped by individuals in an older black automobile with the license plate number "CTJ6423." (Tr. 1028). Officer Lynch was at the hospital for an unrelated matter, but when this information was given to her, she began broadcasting the plate number and the car's description over the police radio; this occurred at approximately 11:13 p.m. (Tr. 910, 1027, 1029-1030). Officer Lynch then began obtaining further information from the victim, including a detailed description of the assailants and the crimes. Officer Lynch broadcasted the description of the assailants over the police radio.

While this investigation was occurring, a sexual assault nurse at the hospital examined M.K. and completed a rape kit. The rape kit included swabs of the victim's mouth, vagina, and rectum. (Tr. 1588-189). Once

completed, the rape kit was sealed and taken into police custody. (Tr. 1045-1050).

At approximately 11:30 p.m. Youngstown Police Officer Anthony Vitullo, who was on patrol and had heard Officer Lynch's broadcast, pulled his cruiser into the Dairy Mart at the intersection of Mahoning Avenue and Bella Vista. He noticed a black car at pump seven. (Tr. 1061). As the car was pulling out he noticed that the license plate number on the car as "CTJ6243." (Tr. 1061). The plate number was not the exact number that had been broadcasted over the radio, however, the numbers were very close. The number broadcasted over the radio was "CTJ6423." Given that the car matched the description and that the license plate number was very similar to the one broadcasted, Officer Vitullo began following the car.

The black automobile pulled onto Mahoning Avenue and headed east toward downtown. (Tr. 1062). It then merged onto I-680 southbound and exited at the first exit, Glenwood Avenue. (Tr. 1063). The black automobile then ran the stop sign, turned southbound on Edwards Street, and pulled into the first driveway on the west side of the street. (Tr. 1063, 1065).

Officer Vitullo followed the car the whole time; however, he did not activate his overhead lights. Upon arriving at the Edwards Street address, Officer Vitullo remained at his car waiting for backup before approaching the car. (Tr. 1065-1067). Moments later backup arrived, including Officer Schiffhauer from the YPD K-9 unit. The officers proceeded to the car. Upon reaching the car, the officers noticed that the driver of the vehicle had fled on foot. However, the passengers, Moore, Bundy, and Callier, remained in the vehicle and were subsequently arrested and detained. The passengers informed the police that the driver's name was "Shorty Mack."

At that point, the K-9 unit began trying to track the driver of the vehicle. Officer Schiffhauer was unable to track and find the driver, but he was able to determine that the driver headed west. (Tr. 1111).

At 11:50 p.m., Youngstown Police Officer Ronnie Jones heard the broadcast that the driver from the suspected automobile had fled on foot. (Tr. 1152-1155). He then set up a perimeter and positioned his cruiser on Glenwood Avenue near Bernard Street in Volney Rogers parking lot. (Tr. 1155). Approximately five minutes later Officer Jones noticed Bunch "trotting" by on Glenwood Avenue. (Tr. 1157-1158). Officer Jones placed the spotlight on Bunch and Bunch slowed to a walk. (Tr. 1157-1158). Bunch proceeded to the side door of 349 Glenwood Avenue and began knocking. (Tr. 1158-1159).

Lamont Hollingshead lived at 349 Glenwood Avenue. He opened the door when Bunch knocked, but Hollingshead would not let Bunch in because he did not know who Bunch was. Hollingshead testified that Bunch claimed to being chased by the police for a curfew violation. (Tr. 1184-1185). Bunch asked Hollingshead to tell the police he was Bunch's uncle. (Tr. 1184). Believing that the police were after Bunch for a curfew violation, Hollingshead complied with Bunch's request. (Tr. 1184).

Officer Jones questioned both Hollingshead and Bunch. Bunch informed the officer that he was sixteen years old, that his name was Chaz Bunch, and that he was on his way from his uncle's house to his cousin's house. (Tr. 1159-1161). Given the explanation and the fact that Bunch did not match the description of the driver that was broadcasted over the police radio, Officer Jones let Bunch go. The description broadcasted over the radio was that the driver was wearing gray sweats and went by the name of "Shorty Mack." (Tr. 1161-1162, 1167-1169). Bunch was wearing navy blue pants, a navy blue top with a white T-shirt underneath it. (Tr. 1164). Moore

was wearing gray sweatpants, thus, the wrong description was broadcasted over the radio. (Tr. 1162).

After Officer Jones left, Bunch paid Hollingshead to make a telephone call from his house. Bunch called Brandy Miller; Brandy Miller's testimony and telephone records confirmed this. (Tr. 1195-1198, 1572-1573).

Three days later, while at roll call, Officer Jones was informed that the subject that fled the automobile on the night of the rape was suspected to be Bunch. Officer Jones informed his superiors that on the night of the rape he had seen an individual who identified himself as Chaz Bunch. Officer Jones was shown a photo array with Bunch in it; he identified Bunch as the individual he saw on the night of the rape. Bunch was subsequently arrested.

During the investigation of the rape, the police inventoried the black automobile. In inventorying the car, the police found the victim's belongings. (Tr. 1071-1073, 1097, 1206-1208, 1211-1212). The police also found a vehicle registration and credit union card belonging to Jason Cosa. (Tr. 1213, 1251, 1406-1407). Also in the car was a .38 caliber handgun and one blue and one black wave cap. (Tr. 1073-1074, 1097, 1208-1209).

Additionally, in further investigating the crimes, the police interviewed M.K. On August 22, 2001, M.K. was shown a series of photographic line-ups. (Tr. 910-911, 1425, 1433). She positively identified Bundy as the driver of the dark older automobile that watched the entire time. (Tr. 913, 14488). She also identified Callier as the person who went through her trunk and as the person who stopped the rape. (Tr. 913-914, 1451-1452). She identified Moore as the first gunman who abducted, robbed and raped her. (Tr. 919-920, 1446). She signed each individual photograph indicating the identifications. (Tr. 913, 920, 1446, 1448, 1451).

As to Bunch's identification, she was drawn to the photograph of him as being the second gunman, but she informed the detectives that she wanted to see a full body picture before signing the photograph. The police were unable to put together a full body array because they were unable to find juveniles of that build. (Tr. 1450). However, on September 7, 2001, the victim saw a local newspaper which showed a picture of Bunch from mid-chest up. Upon seeing this picture, the victim immediately knew that Bunch was the second gunman and called her victim-witness advocate to inform her of this information.

Furthermore, evidence that was obtained during the investigation was sent away for fingerprint and DNA testing. The rape kit was tested at BCI. The semen sample from the vaginal swab, rectal swab and the victim's shorts were not consistent with Bunch's DNA. However, it was determined that Moore could not be excluded; the chance of finding another individual with the same DNA as Moore was one in 94,000,000,000,000,000,000. (Tr. 1670). No fingerprints were found on the .38 caliber gun.

The police also obtained the video surveillance from Dairy Mart. Still pictures were made from the video surveillance. The pictures showed Callier and Bunch purchasing food and gas for pump seven.

Also, the police conducted interviews with the suspects. On August 22, 2001, Andre Bundy was interviewed by the police. Bundy admitted to being the driver of the black automobile. (Tr. 1419). Bundy also stated that he had Callier stop the rape. (Tr. 1421).

Moore was interviewed on August 23, 2001. He informed the detective that he was the individual who robbed Cosa and Hammond. He stated that he was the individual who first approached M.K. and forced her into her car at gunpoint. He then admitted to raping her. (Tr. 1431). However, he claimed that he committed the crimes because an individual

known as "Shorty Mack" made him do it. (Tr. 1464). He also claimed that the gun he used that night was a fake. (Tr. 1472).

Callier was then interviewed by the police and also testified at trial. (Tr. 1276-1400). He testified that both Bunch and Moore raped M.K. (Tr. 1264). He stated that Bunch was the driver of the black automobile when it left the Dairy Mart. He then stated that once Bunch pulled the car into the house on Edwards Street, Bunch told them to tell the police that he was "Shorty Mack." (Tr. 1274). Callier also saw the pictures from Dairy Mart and indicated that he and Bunch were in the pictures. (Tr. 1276).

*State v. Bunch*, 7th Dist. Mahoning No. 02 CA 196, 2005-Ohio-3309, ¶ 2-3.

Appellant filed a pro se post-conviction petition on June 12, 2003, which was not ruled on initially.

In April 2013, Appellant filed a Delayed Application for Reconsideration contending his sentence was unconstitutional pursuant to *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Co-defendant Brandon Moore also filed a delayed application for reconsideration. We denied both applications. Those decisions were appealed to the Ohio Supreme Court.

While those decisions were pending in the Ohio Supreme Court, Appellant filed an application for DNA testing, which the trial court denied and we affirmed the denial. *State v. Bunch*, 7th Dist. Mahoning No. 14 MA 168, 2015-Ohio-4151.

Thereafter in 2016, the Ohio Supreme Court reversed our decision denying the delayed application for reconsideration of Brandon Moore's sentence. *State v. Moore*, 149 Ohio St.3d 557, 2016-Ohio-8288, 76 N.E.3d 1127. The court concluded Moore's sentence was unconstitutional because "*Graham's* categorical prohibition of sentences of life without the possibility

of parole for juveniles who commit nonhomicide crimes applies to juvenile nonhomicide offenders who are sentenced to term-of-years sentences that exceed their life expectancies." *Id.* at ¶ 100.

The Ohio Supreme Court, however, declined to review Appellant's denial of the application for reconsideration.

Approximately two months after the Ohio Supreme Court decision in *Moore*, Appellant filed his first amended postconviction petition. 2/22/17 First Amended Postconviction Petition. Three claims were raised in this petition. The first claim was based on the *Moore* decision. 2/22/17 First Amended Postconviction Petition. The second claim was based on the Ohio Supreme Court's decision in *Aalim I*, which held that the mandatory transfer of juveniles to the general division of a common pleas court violates the juveniles' right to due process as guaranteed by the Ohio Constitution. *See State v. Aalim*, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, ¶ 31 (*Aalim I*), *reconsideration granted, decision vacated,* 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 31 (*Aalim II*). While Appellant acknowledged that *Aalim II* vacated the *Aalim I* decision and held that there was no constitutional violation for mandatory transfers of juveniles, Appellant argued the issue to preserve it for appeal. 1/18/18 Defendant Response to State's Motion for Judgment on the Pleadings. The third claim was that appellate counsel was ineffective for failing to hire an expert witness regarding the unreliability of eyewitness identification. 2/22/17 First Amended Postconviction Petition. Appellant admitted counsel attacked the credibility of the identification on cross-examination, but argued an expert was needed to support that attack. 1/18/18 Defendant Response to State's Motion for Judgment on the Pleadings.

In response to the petition, the state filed a motion for judgment on the pleadings. 11/22/17 Motion. The state conceded that the first claim had merit and Appellant was entitled to resentencing. It argued the second claim

failed based on *Aalim II.* As to the third claim, it contended counsel was not ineffective for failing to call an expert. Counsel relied heavily on cross-examination to demonstrate the victim's identification of Appellant as the fourth assailant was reliable.

The trial court granted the judgment in part and denied the judgment in part. 1/29/18 J.E. The trial court found merit with the first claim and ordered resentencing. 1/29/18 J.E. However, as to the second and third claims, the trial court denied them for the reasons asserted by the state. 1/29/18 J.E.

Appellant timely appealed the decision. After the briefs were submitted, the parties jointly asked for the appeal to be held in abeyance until a new sentence was imposed. 6/15/18 Motion. We granted the request and indicated that following the resentencing, Appellant could determine whether he needed to amend his notice of appeal.

Sentencing memorandum was filed by both parties, and a resentencing hearing occurred on September 6, 2019. The trial court sentenced Appellant to an aggregate sentence of 49 years. He received 3 years on each of the three firearm specifications for a total of 9 years. He received 10 years for aggravated robbery, 10 years for each of the three rapes to run consecutive to each other and consecutive to the aggravated robbery sentence. He received 10 years for each of the three complicity to rape convictions and 10 years for the kidnapping conviction. Those sentences were ordered to run concurrent to each other and concurrent with the other sentences. He also received 6 months for aggravated menacing, which was ordered to run concurrent to the other sentences.

A sexual classification hearing was then held. Since the crimes occurred prior to the tier system, Appellant was subject to the old classification system under Megan's Law. The trial court classified him a sexual predator.

Appellant amended his notice of appeal to include the sentence and sexual predator classification. This appeal can be divided into three parts. The appeal of the postconviction relief petition, the appeal of the sentence, and the appeal of the sexual offender classification.

*Bunch*, 2021-Ohio-1244, at ¶ 3-16 (7th Dist.).

**{¶3}** Appellant timely appealed the 49-year sentence and his sexual predator designation. This court combined Appellant's appeal regarding his post-conviction petition and the September 6, 2019 re-sentencing hearing. *See Id.*

**{¶4}** While this appeal was pending, Appellant filed a timely post-conviction petition pursuant to R.C. 2953.21 on November 6, 2020. Thereafter, he filed a first amended post-conviction petition on May 3, 2021. This separate petition was filed with respect to the September 6, 2019 re-sentencing hearing. Appellant filed this first amended petition pursuant to an agreement with the State to allow the amendment because COVID restrictions prevented counsel from interviewing a necessary witness and Appellant had the right to amend since the State had not yet filed a response to his petition for post-conviction relief. Appellant points out that DeJuan Adams, the purported victim in another one of Appellant's juvenile delinquency cases involving felonious assault which was dismissed, Case No. 2000 JA 288, originally told the detective that Appellant did not shoot him. Appellant indicates Adams was incarcerated at the time of Appellant's sentencing, not missing as suggested by the State.

**{¶5}** This court affirmed the trial court's denial of Appellant's post-conviction petition, his 49-year sentence, and his sexual predator designation. *Bunch,* 2021-Ohio-1244 (7th Dist.).

**{¶6}** Appellant appealed to the Supreme Court of Ohio which accepted jurisdiction. On December 29, 2022, the Supreme Court concluded that Appellant's ineffective assistance claim presented an issue that the trial court needed to examine at an evidentiary hearing before reaching its decision. *State v. Bunch*, 2022-Ohio-4723, ¶ 3. Thus, the Supreme Court reversed this court's judgment and remanded the case to the trial court to conduct an evidentiary hearing on the eyewitness-identification claim in Appellant's petition for post-conviction relief. *Id.*

**{¶7}** While Appellant's appeal was still pending in the Supreme Court of Ohio, on June 3, 2021, the trial court denied without a hearing Appellant's first amended post-conviction petition. Specifically, the court stated:

> This matter came before the Court on Defendant's Petition for Post-Conviction Relief. The State filed a Response and the Court has reviewed both documents. Defendant's Petition alleges that he was denied effective assistance of counsel. He states that because counsel failed to conduct a reasonable investigation into a witness in one of Defendant's juvenile cases.
>
> The State asserts that Defendant bears the burden of demonstrating a constitutional violation. The State further argues that any errors which were in the pre-sentence investigation report were harmless error.
>
> The Court finds that the Petitioner-Defendant has failed to establish substantive grounds for relief. The Court further finds that Petitioner-Defendant has not demonstrated that counsel's performance fell below an objective standard or reasonableness nor has he demonstrated that the result of the proceedings would have been different.
>
> Based upon the foregoing, Petitioner-Defendant's Petition is overruled.

(6/3/2021 Judgment Entry).

**{¶8}** Appellant filed the instant appeal, Case No. 21 MA 0067, and raises two assignments of error. This matter had been previously stayed on Appellant's motion on March 22, 2023 and was reactivated on March 15, 2024.

## ASSIGNMENT OF ERROR NO. 1

**TRIAL COUNSEL IS INEFFECTIVE PURSUANT TO THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN HE DOES NOT INVESTIGATE ALL AGGRAVATING FACTORS TO BE USED BY THE GOVERNMENT WHEN SUCH AN INVESTIGATION**

**WOULD HAVE REVEALED THE GOVERNMENT'S ARGUMENT TO BE MERITLESS AS TO THAT AGGRAVATING FACTOR.**

**ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT ERRED WHEN IT FAILED TO HOLD A HEARING ON MR. BUNCH'S FIRST AMENDED POSTCONVICTION PETITION WHEN HE STATED A SUBSTANTIVE GROUND FOR RELIEF AS HE MADE A PRIMA FACIE CASE THAT HE WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL.**

**{¶9}** In his first assignment of error, Appellant contends his trial counsel rendered ineffective assistance because he failed to properly investigate the circumstances surrounding his dismissed felonious assault case against DuJuan Adams in Case No. 2000 JA 288. Appellant asserts the resulting failure prejudiced him because the allegations regarding the felonious assault were used to enhance the sentence in this case as an aggravating factor.

**{¶10}** In his second assignment of error, Appellant contends the trial court erred in not holding a hearing on his first amended post-conviction petition and claims he was deprived of the effective assistance of counsel at re-sentencing when his representative failed to properly investigate the circumstances surrounding his prior cases.

**{¶11}** In both assignments of error, Appellant takes issue with his trial counsel's representation and argues the trial court abused its discretion in denying his first amended petition for post-conviction relief without a hearing with respect to the September 6, 2019 re-sentencing hearing. Thus, because his assignments are interrelated, we will address them in a consolidated fashion.

**{¶12}** "We apply an abuse of discretion standard when reviewing a trial court's decision to deny a post-conviction relief petition without a hearing." *State v. Chapman*, 2020-Ohio-5589, ¶ 5 (7th Dist.), citing *State v. Gondor*, 2006-Ohio-6679, ¶ 58. An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

Case No. 21 MA 0067

Post-conviction relief is a collateral civil attack on a criminal judgment. *State v. Steffen*, 70 Ohio St.3d 399, 410, 1994-Ohio-111, 639 N.E.2d 67. R.C. 2953.21 through R.C. 2953.23 govern petitions for post-conviction and provide that "any defendant who has been convicted of a criminal offense and who claims to have experienced a denial or infringement of his or her constitutional rights may petition the trial court to vacate or set aside the judgment and sentence." *State v. Martin*, 7th Dist. No. 12 MA 167, 2013-Ohio-2881, ¶ 13.

. . .

"(P)ursuant to R.C. 2953.21(C), a trial court properly denies a defendant's petition for postconviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *State v. Calhoun*, 86 Ohio St.3d 279, 291, 1999-Ohio-102, 714 N.E.2d 905. Substantive grounds for relief exist where there was a denial or infringement of the petitioner's constitutional rights so as to render the judgment void or voidable. *State v. Cornwell*, 7th Dist. No. 00-CA-217, 2002-Ohio-5177, ¶ 25.

*State v. Smith*, 7th Dist. Mahoning No. 17 MA 0041, 2017-Ohio-7770, ¶ 8-10.

"A postconviction petition may also be dismissed without a hearing where the claims are barred by res judicata." *State v. West*, 7th Dist. Jefferson No. 07 JE 26, 2009-Ohio-3347, ¶ 24. Res judicata bars any claim or defense that was raised or could have been raised in an earlier proceeding:

Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due

process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

*State v. Perry*, 10 Ohio St.2d 175, 180, 226 N.E.2d 104 (1967).

*Chapman*, 2020-Ohio-5589, at ¶ 5-6 (7th Dist.).

**{¶13}** Appellant claims his trial counsel was constitutionally ineffective for failing to investigate in 2019 the circumstances involving his criminal history contained in the PSI that was created 17 years earlier in October 2002.

**{¶14}** "(T)he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052 (1984).

In order to demonstrate ineffective assistance of counsel, Appellant must show that trial counsel's performance fell below an objective standard of reasonable representation, and prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland* (*, supra*). Both prongs must be established: If counsel's performance was not deficient, then there is no need to review for prejudice. Likewise, without prejudice, counsel's performance need not be considered. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

In Ohio, a licensed attorney is presumed to be competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In evaluating trial counsel's performance, appellate review is highly deferential as there is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. Appellate courts are not permitted to second-guess the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

Even instances of debatable strategy very rarely constitute ineffective assistance of counsel. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987). The United States Supreme Court has recognized that there are "countless ways to provide effective assistance in any given case." *Bradley* at 142, citing *Strickland* at 689.

To show prejudice, a defendant must prove his lawyer's deficient performance was so serious that there is a reasonable probability the result of the proceeding would have been different. *Carter* at 558. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d 136 at fn. 1, 538 N.E.2d 373, quoting *Strickland* at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair as a result of the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, 651 N.E.2d 965, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

. . .

[A]n ineffective assistance of counsel claim cannot be predicated upon supposition. *State v. Watkins*, 7th Dist. Jefferson No. 07 JE 54, 2008-Ohio-6634, ¶ 15. Likewise, proof of ineffective assistance of counsel requires more than vague speculations of prejudice. *Id.* ¶ 55, citing *State v. Otte*, 74 Ohio St.3d 555, 565, 1996-Ohio-108, 660 N.E.2d 711.

*State v. Rivers*, 2019-Ohio-2375, ¶ 20-23, 27 (7th Dist.).

**{¶15}** "[B]efore a hearing is granted, 'the petitioner bears the initial burden to submit evidentiary documents containing *sufficient operative facts* to demonstrate the lack of competent counsel *and* that the *defense was prejudiced* by counsel's ineffectiveness.'" (Emphasis sic.) *Calhoun*, 86 Ohio St. 3d at 283, quoting *Jackson*, 64 Ohio St.2d at 107, syllabus.

**{¶16}** At Appellant's September 6, 2019 re-sentencing hearing, the State highlighted Appellant's lengthy juvenile record, including Case No. 2000 JA 288, in which

he was charged with felonious assault against DuJuan Adams. The State noted, "In January of 2000 he was accused of felonious assault. However, charges were dismissed when the witness could not be located." (9/6/2019 Re-sentencing Hearing Tr., p. 8). The PSI also reveals that Case No. 2000 JA 288 was "Dismissed due to prosecutor's failure to find witness." (October 2002 PSI, p. 11). Whether Adams was uncooperative or could not be located, he was unavailable.

{¶17} Neither Appellant nor his trial counsel objected to the statements made in the PSI. R.C. 2951.03(B)(5) sets forth a defendant's duty to object to any inaccuracy alleged in the PSI:

> (5) If the comments of the defendant or the defendant's counsel, the testimony they introduce, or any of the other information they introduce alleges any factual inaccuracy in the presentence investigation report or the summary of the report, the court shall do either of the following with respect to each alleged factual inaccuracy:

> (a) Make a finding as to the allegation;

> (b) Make a determination that no finding is necessary with respect to the allegation, because the factual matter will not be taken into account in the sentencing of the defendant.

R.C. 2951.03(B)(5).

{¶18} Neither trial counsel nor Appellant called into question the State's reference to the allegations and statements set forth in the PSI regarding Case No. 2000 JA 288. Even if Appellant had objected, a harmless error analysis would apply.

> . . . [T]his court has held that a harmless error analysis is applicable for the failure to comply with R.C. 2951.03(B)(5). *State v. Oliver,* 7th Dist. No. 09MA44, 2010-Ohio-4182, ¶ 45-46 (*Oliver II*). We explained that the failure to make the requisite finding amounts to harmless error if the record reflects that none of the trial court's findings or considerations would be affected by the alleged inaccuracies in the report. *Id.* at ¶ 45, citing *State v.*

*Caudill,* 5th Dist. 06COA42, 2007–Ohio–6175, ¶ 21–22, *State v. Platz,* 4th Dist. No. 01 CA33, 2002–Ohio–6149, at ¶ 18, *State v. Roby,* 11th Dist. No.2001–A–0029, 2003–Ohio–603, ¶ 53.

*State v. Latronica*, 2014-Ohio-3685, ¶ 15 (7th Dist.).

**{¶19}** The record establishes that none of the trial court's findings or considerations were affected by any alleged inaccuracy in the PSI. *See* (9/6/2019 Re-sentencing Hearing Tr., p. 75-81).

**{¶20}** Appellant believes his felonious assault case according to the purported victim was most likely dismissed because the purported victim had told detectives that Appellant was not the culprit. Attached to Appellant's first amended petition for post-conviction relief is the affidavit of DuJuan Adams. (5/3/2021 First Amended Petition); (Exhibit 1). Adams' affidavit states in its entirety:

> I, DuJuan Adams, swear that the following is true based on my personal knowledge:

> When I was 18 years old, I was arrested for driving without a license and held in the Mahoning County Jail.

> At that time, I was questioned by a detective about whether Chaz Bunch was involved in a shooting. I told the detective that Chaz Bunch did not shoot at me and that he was not involved in the shooting.

> I also provided this information at a hearing for Chaz Bunch where I said that he was not involved in the shooting and that he did not shoot at me.

(Exhibit 1, Affidavit of DuJuan Adams).

**{¶21}** The affidavit was signed by DuJuan Adams (Inmate No. 395935), dated March 30, 2021, and notarized. (*Id.*). Adams' 2021 affidavit claiming Appellant did not shoot him in 2000 lacks credibility because it conflicts with the record. In Case No. 2000 JA 288, DuJuan Adams named Appellant as the suspect that shot him on January 18,

2000 in his victim-impact statement; Adams told Youngstown detectives that Appellant shot him on January 18, 2000; Adams refused to cooperate in Appellant's juvenile adjudication in that case; and the parties stipulated that probable cause existed that Appellant shot Adams on January 18, 2000. *See* (5/20/2021 State's Motion for Summary Judgment, Exhibit 1). Although the PSI was inaccurate as to why Case No. 2000 JA 288 was dismissed, it is not untrue that Adams was unavailable. The record from that case establishes the State's allegations that Appellant did in fact shoot DuJuan Adams on January 18, 2000.

**{¶22}** DuJuan Adams, a convicted felon, was later released from prison in 2023 following his sentence for two counts of attempted murder. He is currently being supervised by the Adult Parole Authority. *See State v. Adams*, 2006-Ohio-1761 (7th Dist.); *State v. Adams*, 2013-Ohio-1433 (7th Dist.); https://drc.ohio.gov/OffenderSearch (accessed Aug. 21, 2024).

**{¶23}** Considering the record from Case No. 2000 JA 288 and DuJuan Adams' criminal history, his affidavit lacks credibility. *See State v. Billman*, 2013-Ohio-5774, ¶ 43 (7th Dist.) ("Where a witness recants and/or offers a post-trial confession, the trial court must determine which of the contradicting statements of that witness are credible. . . . The court's discretion in these matters extends to determining whether the later confession or recantation is credible.") (Internal citations omitted). DuJuan Adams' affidavit does not establish that a reasonable investigation would have resulted in a shorter sentence in Appellant's instant case.

**{¶24}** Regarding Appellant's sentence, this court previously recognized:

> The facts involving this case speak for themselves and do not engender sympathy. . . . [Bunch] robbed the victim at gunpoint and then vaginally, anally, and orally raped her. The facts establish she was brutally gang raped by [Bunch] and Moore. The record supports the findings.

*Bunch*, 2021-Ohio-1244, at ¶ 52 (7th Dist.), *rev'd on other grounds*, 2022-Ohio-4723; *see also Bunch*, 2005-Ohio-3309, at ¶ 171 (7th Dist.) ("This is easily considered the worst form of the offense.")

Case No. 21 MA 0067

**{¶25}** Upon consideration, the trial court did not abuse its discretion in denying Appellant's first amended petition for post-conviction relief without a hearing with respect to the September 6, 2019 re-sentencing hearing.  Appellant cannot sufficiently show that any failure to properly investigate the circumstances involving his criminal history contained in the October 2002 PSI amounts to ineffective assistance of counsel.

**{¶26}** Appellant's petition, supporting documents, and the record fail to sufficiently state substantive grounds for relief to demonstrate that he was deprived of the effective assistance of counsel. The record establishes trial counsel's representation was constitutionally effective and did not affect Appellant's rights. Counsel's performance was neither deficient nor prejudicial. Appellant fails to demonstrate ineffective assistance of counsel. *See Strickland, supra.*

**{¶27}** Appellant's first and second assignments of error are without merit.

## CONCLUSION

**{¶28}** For the foregoing reasons, Appellant's assignments of error are not well-taken.  The June 3, 2021 judgment of the Mahoning County Court of Common Pleas denying Appellant's first amended petition for post-conviction relief without a hearing is affirmed.


Robb, P.J., concurs.

Hanni, J., concurs.

[Cite as *State v. Bunch*, 2024-Ohio-5040.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**